John N. NICHOLSON, Plaintiff,

v.

PROMOTORS ON LISTINGS, Pollstar,
Gary Bongiovanni, Defendants.

Civ. A. No. 91–11056–PBS.

United States District Court,
D. Massachusetts.

Dec. 9, 1994.

John H. Nicholson, pro se.

Calvin C. Carr, Dedham, MA, for plaintiff.

John J. Lang, Driscoll, Gillespie & Stanton, Lynnfield, MA, for defendants.

## ORDER

SARIS, District Judge.

Plaintiff has filed objections to the Findings and Recommendations on Defendants' Motion for Summary Judgment (docket 26) entered by Magistrate Judge Alexander on May 17, 1994. After hearing, the court overrules the objections and orders entry of summary judgment for the defendants.

In light of the thoroughness of Magistrate Judge Alexander's opinion, the court only addresses the primary objections raised by the *pro se* plaintiff.

First, plaintiff argues that he should not be deemed a limited public figure under *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 341, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) which extends the "actual malice" rule to speech concerning someone who has injected himself into a public controversy so as to become a public figure for the issue to which the speech is directed. Although he had management responsibility for the Lowell Memo-

rial Auditorium, including its finances, he argues he was not a public figure because he was a part-time private contractor, not a public employee; he was not well known in Lowell either to the public, the press, or the city officials; he reported to the Lowell Auditorium Board of Trustees, which had the ultimate responsibility for overseeing the auditorium's activities; and he did not thrust himself into the controversy over the auditorium's finances "but was forced into it" by the media with false statements of fact.

■ Whether an individual is a public figure is a matter of law for the court to decide. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966); *Trotter v. Jack Anderson Enterprises, Inc.,* 818 F.2d 431, 433 (5th Cir.1987).

The First Circuit, in *Kassel v. Gannett Co., Inc.,* 875 F.2d 935 (1st Cir.1989), declined to reach the question of whether plaintiff became a limited purpose public figure by thrusting himself into an ongoing public controversy or by agreeing to be interviewed by a newspaper. *See id.* at 938 n. 2. *Kassel* instead considered whether the allegedly defamed individual was a "public official"—a classification defined to encompass those who have substantial responsibility for or control over the conduct of governmental affairs, who have access to channels of effective communication, and who seek positions of influence in public life. *Id.* at 939.

■ In her erudite recommendation, Magistrate Judge Alexander applied the areas of inquiry limned by *Kassel* in determining whether plaintiff was a limited public figure. A strong argument can be made that an independent contractor who meets the *Kassel* test qualifies as a "public official." However, this court sees no need to examine the question whether the "public official" classification is so capacious as to include individuals who are not salaried public employees. Rather, this court concludes that the plaintiff is a "limited-purpose public figure" as that term is explained by the Supreme Court in *Gertz,* and by leading interpretations of *Gertz* in the other Circuits.

The D.C. Circuit has taken the lead in developing a test for determining when an individual attains limited purpose public figure status. It set forth a three-part test: (1) the controversy at issue must be public in the sense that people are debating it and that it has foreseeable and substantial ramifications for nonparticipants; (2) the plaintiff must have more than a trivial or tangential role in the controversy and must have thrust himself to the forefront of the controversy so as to become a factor in its ultimate resolution; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *See Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296–98 (D.C.Cir.1980); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 246, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1985) (citing *Waldbaum* with apparent approval); *Tavoulareas v. Piro,* 817 F.2d 762, 771–75 (en banc) (D.C.Cir.) (applying *Waldbaum* test), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). *See also Clyburn v. News World Communications, Inc.,* 903 F.2d 29, 31–32 (D.C.Cir.1990). The Fifth Circuit has long followed the D.C. Circuit test. *See Trotter,* 818 F.2d at 433.

The Fourth Circuit has developed a five part test: (1) whether the plaintiff had access to channels of effective communication; (2) whether the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) whether the plaintiff sought to influence the resolution or outcome of the controversy; (4) whether the controversy existed prior to the publication of the defamatory statement; and (5) whether the plaintiff retained public-figure status at the time of the alleged defamation. *See Foretich v. Capital Cities/ABC Inc.,* 37 F.3d 1541 (4th Cir. 1994).

Here, the record is undisputed that the controversy was over public expenditures at a municipal auditorium, that plaintiff had more than a trivial or tangential role in the controversy and that the alleged defamation was germane to the plaintiff's participation in the controversy. He voluntarily entered the public arena when he assumed a management role at a public auditorium, and sought to influence the resolution or outcome of the controversy over its finances. As plaintiff himself pointed out, he was a former journal-

ist with a "reputation" in the entertainment field and hence had access to channels of effective communication. Finally, at the time of the alleged defamation, the controversy was both preexisting and ongoing. Thus, plaintiff easily qualifies as a limited public figure under the test articulated in *Waldbaum*, as well as under the Fourth Circuit test, both of which mirror certain key aspects of the test for public official in *Kassel*.

Plaintiff's argument that he was a private contractor, not a public employee, is unavailing, for it is well established that a limited purpose public figure does not have to be a salaried public employee. *See, e.g., Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 708–09 (4th Cir.), *cert. denied*, 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991) (scientist employed by a firm under contract with the National Cancer Institute was a limited purpose public figure); *Clyburn*, 903 F.2d at 31 (owner of consulting firm which frequently contracted with the D.C. government was a limited purpose public figure); *Trotter*, 818 F.2d at 434 (president of a private business involved with labor violence was a limited-purpose public figure). As a private contractor plaintiff performed many high level functions often performed by a public official.

The fact that plaintiff was not well known to the general public until the controversy over the finances was reported in the *Lowell Sun* is likewise not dispositive of plaintiff's limited "public figure" status. As the Fifth Circuit said in *Trotter*:

> Creating a public issue ... is not the same as revealing one. The purpose of investigative reporting is to uncover matters of public concern previously hidden from the public view. We agree with the District of Columbia Circuit that the first newspaper to report on a pre-existing public dispute should not be held to a stricter standard of liability than those who follow. To hold otherwise would undermine the purpose of the public-figure doctrine—encouraging debate on issues of public concern.

*Id.* at 434. Here, the *Lowell Star* uncovered a matter of public concern; it did not create it. This Court concludes that plaintiff was a limited purpose public figure with respect to

the events that form the subject of this controversy.

The second primary objection raised by plaintiff is that—even if he qualified as a public figure—there was a disputed issue of fact as to whether defendants acted with actual malice. Even assuming that plaintiff's allegations of falsehood were enough to support a genuine issue of material fact as to falsehood, there is no evidence in the record that the *Pollstar* and the reporter Bongiovanni acted with "actual malice" in republishing a summary of the article in the *Lowell Sun* regarding the investigation of the auditorium's finances. *Cf. Appleby v. Daily Hampshire Gazette*, 395 Mass. 32, 38, 478 N.E.2d 721, 725 (1985).

With respect to the April 11, 1988 article, the only evidence of actual malice to which Mr. Nicholson points shows that Bongiovanni knew of his reputation in the entertainment community. This knowledge, it is argued, should have put Bongiovanni on notice of the falsity of the allegations. However, the most culpable state of mind this evidence could possibly support is negligence, particularly since the bulk of the article is reporting on an investigation conducted by a reputable newspaper.

With respect to the second article, published on January 16, 1989, plaintiff points to evidence that after the first article, he called and wrote the reporter to put him on notice of the inaccuracies and yet the reporter still failed to call him to verify. Further, he points to evidence that defendants' re-reporting of the information in the *Lowell Sun* was inaccurate. The only alleged inaccuracy in this article is the use of the word "intensified" in the following sentence: "The local probe into the financial affairs of the *LOWELL MEMORIAL AUDITORIUM* in Lowell, MA has intensified."

Even assuming that the magistrate judge is correct that there is a disputed issue of fact as to whether this term constitutes a falsehood, and even assuming the reporter may have been negligent in failing to call Mr. Nicholson to hear his viewpoint, this literary embellishment is not so grossly irresponsible so as to constitute actual malice. *Geiger v.*

*Dell Publishing Co., Inc.,* 719 F.2d 515, 517–18 (1st Cir.1983).

## ORDER

For reasons stated by the magistrate judge, as well as those stated above, the court orders entry of summary judgment for the defendants.

## *FINDINGS AND RECOMMENDATIONS ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (# 20)*

May 17, 1994

ALEXANDER, United States Magistrate Judge.

This case presents important questions involving the first amendment of the United States Constitution.[1] While concepts involved are somewhat fluid and amorphous, the salubrious object of the Constitution's protection is not in doubt. As Judge Kaufman has observed:

> In a society which takes seriously the principle that government rests upon the consent of the governed, freedom of the press must be the most cherished tenet. It is elementary that a democracy cannot long survive unless the people are provided the information needed to form judgments on issues that affect their ability to intelligently govern themselves.

*Edwards v. National Audubon Society, Inc.,* 556 F.2d 113, 115 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). The following background will set the stage.

## I. INTRODUCTION

Plaintiff John H. Nicholson was employed part-time as an independent contractor and consultant for the City of Lowell and the Board of Trustees ("the Board") of the Lowell Memorial Auditorium ("the Auditorium"). The Board hired the plaintiff to manage the Auditorium. On April 11, 1988, and on January 16, 1989, defendant Pollstar, the publisher of an entertainment trade publica-tion, printed two articles on the subject of the Auditorium. The April 11 article refers to $157,000 in missing receipts from the Auditorium. The plaintiff figures prominently in this article's account of the missing funds:

> The city auditor in Lowell, Massachusetts seized the financial records and froze the spending of the 2,896–seat **LOWELL AUDITORIUM** because no one could account for an estimated $157,000 in **MISSING RECEIPTS.** The move was made just prior to a March 23rd investigative article in the local daily newspaper The Sun. Managing Consultant **JOHN "JACK" NICHOLSON** has been accused of improperly writing checks to himself (totaling $22,985) and to an employee in violation of state law, hiring a personal friend and paying her $25,900 to help market the venue, and subsidizing three shows at **CAWLEY STADIUM** with auditorium receipts. The paper also reported that there appeared to be no regularity in Nicholson's dealings with promoters, as some were undercharged while others were overcharged for certain expenses. Of the missing $157,000, about $106,000 is due the city for rent and concessions funds; the city received no payments from March of 1987 until The Sun began asking questions last month despite the fact that the auditorium's $500,000 operating budget is paid by the city and the venue has few other expenses. There is also some question about whether or not the auditorium has already utilized some of the **TICKET RECEIPTS** from **UPCOMING SHOWS** to pay current expenses including the overdue rent payments to the city. Nicholson says some of the missing funds, about $35,000, are owed the facility by local promoter **RICK STARR,** who reportedly lost over $100,000 on shows at the stadium last summer. Nicholson says he still thinks Starr will make good on the debt. When asked about the missing receipts, Nicholson originally told the paper "That figure seems impossible to me. This just couldn't be," but later ex-

---

**1.** According to the first amendment:
Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S. Const. Amend. 1.

plained in a formal statement that he became aware of the venue's financial problems last fall and that they are on their way to being solved. **JACK REILLY,** chairman of the auditorium's trustees, said "At this point we see no evidence of dishonesty." But in regards to the financial accounting he added, "We do see evidence of stupidity."

Defendants' Exhibit B (emphasis in original). The subsequent article discusses the intensification of the investigation into the Auditorium's financial affairs:

> The local probe into the financial affairs of the **LOWELL MEMORIAL AUDITORIUM** in Lowell, MA has intensified. Following an audit, the city manager called in the district attorney's office to further investigate the municipal facility's operation for any criminal violations that may have occurred. Also following the audit, City Manager James Campbell fired auditorium managing consultant **JACK NICHOLSON** for alleged financial mismanagement. Although one maintenance and one custodial employee have been charged with improprieties, no criminal charges have been filed against Nicholson. The city has hired Providence Performing Arts Center manager **LYNN SINGLETON** to act as interim managing consultant. . . .

Defendants' Exhibit C (emphasis in original). Plaintiff brings this action for libel, contending that these articles are false and malicious. Defendants move for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

This Court shall render a summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989). An issue is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue

is "genuine" if "'a fairminded jury could return a verdict for the plaintiff on the evidence presented.'" *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 894 (1st Cir.1988) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512). Furthermore, "whether a factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514.

The record as perceived in the light most favorable to the nonmoving party shall control this determination. *Stepanischen v. Merchants Despatch Transportation Corp.,* 722 F.2d 922, 928 (1st Cir.1983) (citation omitted). Thus, this Court will indulge all inferences in favor of the nonmoving party. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) (citations omitted). Accordingly, the moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *Mack v. Cape Elizabeth School Board,* 553 F.2d 720, 722 (1st Cir.1977) (citation omitted). The moving party may discharge this burden by demonstrating "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

After such a showing, the burden shifts to the nonmoving party to establish the existence of a genuine issue of material fact. *Brennan,* 888 F.2d at 191. The Court will enter summary judgment if the nonmoving party fails to establish an element essential to the nonmoving party's case for which the nonmoving party bears the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The nonmoving party may not defeat the motion simply by resting on mere allegations or conclusions set forth in its pleadings. Rather, the nonmoving party must come forward with some evidence of "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great*

*Atlantic and Pacific Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989) (citation omitted). Thus, the First Circuit will reject responses by nonmovants that adduce statements not based on personal knowledge or that adduce conjectural or conclusory allegations. *See Garside v. Osco Drug*, 895 F.2d 46, 49 (1st Cir.1990); *Mack*, 871 F.2d at 181.

While determining the genuineness of any fact issue requires this Court to consider whether the evidence might sway a reasonable jury, this Court does not, at the summary judgment stage, weigh conflicting evidence in search of the truth. Rather, this Court merely determines whether conflicting evidence on any material point presents a clash that is of sufficient legitimacy to make summary disposition inappropriate. *See Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. In other words, this Court must decide whether "there is 'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" *Garside*, 895 F.2d at 48 (quoting *Hahn v. Sargent*, 523 F.2d at 464).

## III. CHOICE OF LAW

In this diversity action, this Court looks to the choice of law rules of Massachusetts, the forum state. *Klaxon v. Stentor Electronic Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In this case, the conflicts principles of Massachusetts point to the application of its own law. It is the state with the "most significant relationship" to the suit, given the citizenship and residence of the plaintiff, the apparent locus of the injury and the plaintiff's failure to suggest an alternative. *See Continental Cablevision v. Storer Broadcasting Co.*, 653 F.Supp. 451, 454–55 (D.Mass.1986); *Flotech v. E.I. Du Pont de Nemours Co.*, 627 F.Supp. 358, 362 (D.Mass. 1985), *aff'd*, 814 F.2d 775 (1st Cir.1987); *Bushkin Associates, Inc. v. Raytheon*, 393 Mass. 622, 631–36, 473 N.E.2d 662, 668–71

(1985). Accordingly, this Court shall apply the law of Massachusetts.

## IV. DEFAMATION

The law of defamation is an amalgam of state common law and federal constitutional limitations upon that common law. Rodney A. Smolla, *Law of Defamation* § 1.01, at 1–3 (6th rel. 1993). In Massachusetts, "[w]ords may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, or ridicule, or tend to impair his standing in the community." *Poland v. Post Publishing Co.*, 330 Mass. 701, 704, 116 N.E.2d 860, 861 (1953) (citations omitted); *see also Milgroom v. News Group Boston, Inc.*, 412 Mass. 9, 12, 586 N.E.2d 985, 988 (1992) (citation omitted). The elements of the libel variety of this cause of action include (1) a writing; (2) that concerns the plaintiff; (3) that was made public; (4) that was false; and (5) that damaged the plaintiff. Richard W. Bishop, 17A *Massachusetts Practice* § 1201 (3d ed. 1987); Joseph R. Nolan & Laurie J. Sartorio, 37 *Massachusetts Practice* § 128 (2d ed. 1989); Smolla, *Law of Defamation* § 1.08, at 1–32.

In Massachusetts, the truth of the writing is an affirmative defense, the burden of proof for which lies with the defendants. Mass. Gen.L. ch. 231, § 92. Bishop, 17A *Massachusetts Practice* § 1210, at 366, § 1213, at 368. Entry of summary judgment in favor of the defendants will be condign if "the uncontroverted facts show that the allegedly libelous statements were true...." *Milgroom*, 412 Mass. at 12, 586 N.E.2d at 988 (citation omitted); *see, e.g., Godbout v. Cousens*, 396 Mass. 254, 261–63, 485 N.E.2d 940, 944–46 (1985) (defendants' uncontroverted affidavits attesting to the truth of their statements warranted entry of summary judgment in their favor).[2]

The state common law defense of truth, however, is only the tip of the iceberg. Because the rendering of a judgment under the common law of libel constitutes an exercise of state power, the restrictions of the first

---

**2.** While it is the federal procedural rule that governs the summary judgment calculus, state caselaw in this area is instructive. Furthermore, it is worth taking note that Massachusetts views its law of defamation as being peculiarly amenable to the summary judgment procedure. *Godb-*

*out*, 396 Mass. at 258, 485 N.E.2d at 943 (1985); *New England Tractor–Trailer Training of Connecticut, Inc. v. Globe Newspaper Co.*, 395 Mass. 471, 480, 480 N.E.2d 1005, 1011 (1985) (citation omitted).

amendment come into play. *New York Times Co. v. Sullivan*, 376 U.S. 254, 265, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964). The Supreme Court has determined that "[a]llowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). In order that the first amendment may foster vigorous debate, the *New York Times* Court held that, under the Constitution, false statements about a public official are not actionable for defamation, absent proof of "actual malice" by clear and convincing evidence. *New York Times*, 376 U.S. at 269–88, 84 S.Ct. at 720–30.

## V. PROTECTED STATUS

### A. *The Elusive Divide*

Over time, the category of defamation plaintiffs subject to the *New York Times* standard has expanded. *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring) (*New York Times* standard should apply to all defamation plaintiffs who are public figures); *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 52, 91 S.Ct. 1811, 1824, 29 L.Ed.2d 296 (1971) (plurality opinion) (extending *New York Times* standard to defamation plaintiffs for publications concerning "event[s] of public or general concern"). Ultimately, the Court settled on the public figure construct to fix the boundaries of the *New York Times*'s protection, leaving speech concerning private individuals outside the cincture of the "actual malice" rule. *Gertz*, 418 U.S. at 343, 94 S.Ct. at 3008–09. Those individuals who have thrust themselves into public affairs are deemed less deserving of state common law protections, as they have a greater opportunity to rebut defamatory falsehoods and have accepted the risk of the rough and tumble debate that runs concomitant with public life. *Gertz*, 418 U.S. at 344–45, 94 S.Ct. at 3009–10. This rationale extends the "actual malice" rule to speech concerning those who have such pervasive fame or notoriety as to be public figures for all purposes and to speech concerning those who

have injected themselves into a public controversy as to become a public figure for the issue to which the speech is directed. *Id.*, 418 U.S. at 351, 94 S.Ct. at 3013. The "actual malice" rule applies to the latter category—the so-called "limited" public figures— "when they are defamed in connection with issues about which they have invited attention, but in all other aspects of their lives ... remain private figures...." Smolla, *supra*, § 2.07, at 2–22. Mere involvement in a controversy that is of interest to the public, however, does not necessarily mean that one has thrust oneself into a public controversy within the meaning of *Gertz*. *Time, Inc. v. Firestone*, 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976); *see also Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 167, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979) ("A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."). Thus, the *Rosenbloom* approach of extending the *New York Times* rule to speech covering issues of public of general concern no longer obtains.

Recognizing the public figure/private citizen distinction is one matter. Etching the finer points on the dividing line is another. *Cf. Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440, 443 (S.D.Ga.1976), *aff'd*, 580 F.2d 859 (5th Cir.1978) ("Defining public figures is much like trying to nail a jellyfish to the wall."). The *Gertz* Court required "clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society" to find that a defamation plaintiff is a public figure for all contexts. To determine whether a plaintiff is a public figure for a limited range of issues, the Court called for an examination of "the nature and intent of an individual's participation in the particular controversy giving rise to the defamation." *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013.

This standard is best understood by its application. The *Gertz* Court determined that a reputable attorney, who was active in community affairs, who represented in civil litigation the family of the victim of a police shooting and who neither spoke to the press

about the police officer tried for the shooting nor became involved in the criminal proceeding was not a public figure on the issue of the criminal proceeding. *Id.,* 418 U.S. at 325–26 & 352, 94 S.Ct. at 3000 & 3013. In *Time, Inc. v. Firestone, supra,* the Court found that the wife of a wealthy industrialist who filed for divorce on grounds of extreme cruelty and adultery was not a public figure. 424 U.S. at 454, 96 S.Ct. at 965. In neither of these cases had the plaintiffs voluntarily injected themselves into a public controversy.

Similarly, in *Wolston,* the Court found that the petitioner's failure to respond to a grand jury subpoena did not make him a limited public figure for the subject matter of the grand jury investigation. The failure to appear was motivated by reasons of health, rather than by any "calculat[ion] to draw attention to himself in order to invite public comment or influence the public with respect to any issue[,]" or by any attempt "to arouse public sentiment in his favor and against the investigation." *Wolston,* 443 U.S. at 168, 99 S.Ct. at 2707–08. The Court also rejected the argument that the conduct of criminal activities makes a person a public figure for a limited range of issues relating to that person's conviction. *Id.,* 443 U.S. at 168, 99 S.Ct. at 2708.

The determination can be particularly difficult when the defamatory matter touches upon issues tangential to governmental operations. The public interest in vigorous debate, necessarily including criticism of government, must be reconciled with society's interest in preventing and redressing unfair injury to reputation. *Rosenblatt v. Baer,* 383 U.S. 75, 85–86, 86 S.Ct. 669, 675–76, 15 L.Ed.2d 597 (1966). Thus, in a decision prior to the advent of the *Gertz* public figure construct, the Court found it clear "that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to have, substantial responsibility for or control over the conduct of governmental affairs." *Id.,* 383 U.S. at 85, 86 S.Ct. at 676. Thus, the *Rosenblatt* Court remanded for a determination of whether the supervisor of a county recreation area, which was owned and oper-

ated by the county, was a public official. *Id.,* 383 U.S. at 87–88, 86 S.Ct. at 677.

In *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), the Court held that a research scientist, whose work was sponsored by federal agencies, was not a public figure for issues relating to the federal funding. "Neither his applications for federal grants nor his publications in professional journals can be said to have invited that degree of public attention and comment on his receipt of federal grants essential to meet the public figure level." *Id.,* 443 U.S. at 135, 99 S.Ct. at 2688. Central to the Court's reasoning was that the claimant "did not thrust himself or his views into public controversy to influence others." *Id.,* 443 U.S. at 135, 99 S.Ct. at 2688. "General concern about public expenditures, even large ones, was not enough, in the Court's view, to activate the *New York Times* test, because that would implicate the discredited *Rosenbloom* approach of subject matter classification and ignore the public figure/private figure compromise struck in *Gertz.*" Smolla, *supra,* § 2.08[3], at 2–29. Furthermore, the claimant's access to the media after the defamatory incident to rebut the accusations was not sufficient to classify him as a public figure. "He did not have the regular and continuing access to the media that is one of the accouterments of having become a public figure." *Hutchinson,* 443 U.S. at 136, 99 S.Ct. at 2688.

The First Circuit has distilled from these cases three areas of inquiry. First, this Court must focus on the importance of the issues and the need for vigorous debate. Second, this Court must consider the plaintiff's access to the media. Third, this Court must consider any assumption of the risk on the part of the plaintiff. *Kassel v. Gannett Co., Inc.,* 875 F.2d 935, 939–40 (1st Cir.1989). In *Kassel,* the court found that a staff psychologist at a Veterans' Administration hospital was a private citizen. He was not in policy-formulating or management position. He did not have any special access to the media. Furthermore, he assumed no risk of sensationalist media coverage by accepting his position. *Id.* at 940–41.

### B. *The Procedural Posture*

Before this Court can apply these principles to the instant case, a procedural squabble must be resolved. The plaintiff contends that the defendants improperly invoke *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 330 N.E.2d 161 (1975), as authority for resolving the public figure/private citizen dispute at the summary judgment stage. Quoting from the Supreme Court, the Massachusetts Supreme Judicial Court (SJC) found in *Stone*: "The determination of the plaintiff's status, whether public official or public figure or private person, 'as is the case with questions of privilege generally, ... is for the trial judge in the first instance.'" 367 Mass. at 862, 330 N.E.2d at 170 (quoting *Rosenblatt*, 383 U.S. at 88, 86 S.Ct. at 677). The defendants, perhaps overzealously, seem to take this statement as meaning that summary judgment is the prescribed route for resolution of the public figure/private citizen question. The plaintiff, on the other hand, points to the SJC's following qualification:

> A full statement of the rule would seem to be that the question whether the plaintiff is a public official or a public figure is one for the court to answer whenever (a) all of the facts bearing thereon are uncontested or agreed by the parties (b) the case is tried before a judge without a jury, or (c) all of the facts bearing thereon are specially found and reported by the jury by way of answers to special questions submitted to them; and that otherwise, in a case tried to the jury, it is a question for the jury to answer after instructions by the judge on the applicable law and on what facts must be found to constitute the plaintiff a public official or a public figure.

*Id.*, 367 Mass. at 862–63, 330 N.E.2d at 170–71. The plaintiff makes the same mistake as the defendant in equating an allocation of questions between law and fact with an allocation between summary judgment and trial. The summary judgment procedure may resolve issues of law, as well as eliminate purported issues of fact that are not genuine or are not material to recovery. *See* Fed. R.Civ.P. 56.

There is further confusion in that the statement from *Stone* does not appear to be in perfect harmony with federal cases, and it is federal law that must control the public figure/private citizen determination. *See Rosenblatt*, 383 U.S. at 85, 86 S.Ct. at 675. As noted, the *Rosenblatt* Court indicated that this question is one for the court. 383 U.S. at 88, 86 S.Ct. at 677. Federal courts often view the question as one of law. *See, e.g., Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 740 (D.C.Cir.1985), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *National Life Insurance Co. v. Phillips Publishing, Inc.*, 793 F.Supp. 627, 631 (D.Md.1992) (collecting cases); *Church of Scientology International v. Eli Lilly & Co.*, 778 F.Supp. 661, 666 n. 3 (S.D.N.Y.1991). It is perhaps more accurate to observe that, while the question is one for the judicial officer, it is a mixed question of law and fact. *See, e.g., Rebozo v. Washington Post Co.*, 637 F.2d 375, 379 (5th Cir.), *cert. denied*, 454 U.S. 964, 102 S.Ct. 504, 505, 70 L.Ed.2d 379 (1981); *Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d 1238, 1247 & n. 13 (5th Cir.), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1980). *Accord* Smolla, *supra*, § 2.29. The question, thus, will be peculiarly susceptible to resolution at the summary judgment stage, provided that the factual record is adequate. *See id.*, § 2.30[1], at 2–102 ("Although the public figure determination is for the trial court in the first instance, the trial court should not rule on the issue at the summary judgment stage if there is a genuine dispute as to material facts relevant to the determination.").

### C. *The Plaintiff's Status*

The stage is, thus, set for this Court to consider the *Gertz* trichotomy's application to the instant case. The facts are as follows. The plaintiff was "well-known and respected for his years of work in the concert and public assembly facility industry." Defendants' Exhibit A, ¶ 4. The plaintiff was hired by the Lowell Auditorium Board of Trustees of the City of Lowell to manage the Auditorium. Defendants' Exhibit D, No. 5(b). He characterizes himself as "an independent contractor," who also "work[ed] independently as a consultant in the entertainment field." Defendants' Exhibit D, No. 5(a). For endeavors relating to the Auditorium, the plain-

tiff received remuneration of $1,700 per week and between $58,000 and $70,000 annually from the city of Lowell. Defendants' Exhibit D, No. 5(c); Defendants' Exhibit I, at 48. The plaintiff, however, characterizes his compensation as a fee, rather than as a salary. *Id.* The plaintiff attempts to characterize his responsibilities for the Auditorium in a minimalist light through his affidavit. Plaintiff's Exhibit 3. This affidavit, however, merely presents the sort of problematic, self-serving and conclusory statements that the First Circuit discounts in the summary judgment calculus. *See Mack,* 871 F.2d at 181.

First, it cannot be gainsaid that the management and operation of a municipal auditorium are of concern to the public. Local governance, no less than national governance, and perhaps more so in the pragmatic workings of our system of federalism, is the concern of all in an open and democratic society. At an abstract level, the management and operation of a municipal auditorium implicate concerns relating to the efficacy of local governance and the integrity of the public fisc. Thus, alleged mismanagement and fiscal impropriety in such an area are inevitably of concern to the public.[3] At a more tangible level, the management and operation of a municipal auditorium affect the cultural opportunities of the surrounding community.[4] Thus, the public will appropri-

ately be concerned with the vicissitudes of its municipal auditorium.

The plaintiff held a publicly funded position. He appears to have held considerable management and operational power and control. His attempts to characterize his responsibilities as minimal are not supported by the record. To the extent the plaintiff's employment was not restricted to the Auditorium, this fact should only serve as to narrow this Court's inquiry to determining whether the plaintiff was a public figure limited to the range of issues relating to his employment by the Auditorium.

Second, this Court looks to the plaintiff's access to channels of communication. The record does not provide much guidance on this point. There is evidence, however, that the plaintiff has worked with larger venues and has admitted to developing "public relations, media and marketing programs" that became the "league standards" for the National Football League. Plaintiff's Exhibit 8, at 4. Whether the plaintiff had developed greater access to the media as a result of his position with the Auditorium is unclear, although the plaintiff has done little to demonstrate otherwise.

Third, this Court turns to the assumption of the risk factor. As noted, the plaintiff's position did have some prominence, given his supervisory responsibilities for an institution of concern to the community. This Court

3. This Court is aware of the rule that, in the context of a person who becomes a public figure limited to a particular controversy, the controversy must pre-exist the alleged defamation. Allowing the media to characterize the plaintiff as a limited public figure by way of printing controversial material about the plaintiff, thereby dragging the plaintiff unwillingly into a public controversy, has been condemned as "bootstrapping." *Hutchinson,* 443 U.S. at 135, 99 S.Ct. at 2688; *Kassel,* 875 F.2d at 941. In the context of wrongdoing, some courts have held that participation inevitably invites media attention. *See, e.g., Marcone v. Penthouse International, Ltd.,* 754 F.2d 1072, 1083–85 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151, *reh'g denied,* 474 U.S. 1014, 106 S.Ct. 548, 88 L.Ed.2d 477 (1985); *Rosanova v. Playboy Enterprises,* 580 F.2d 859, 861 (5th Cir.1978); *Orr v. Argus–Press Co.,* 586 F.2d 1108, 1116 (6th Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *Logan v. District of Columbia,* 447 F.Supp. 1328, 1331 (D.D.C.1978). *But see Wolston,* 443 U.S. at 168, 99 S.Ct. at 2707–08 (failure

to appear before grand jury in violation of law does not make plaintiff limited public figure for issues related to conviction for failure to appear, where violation was not motivated by attempt to gain attention). In the instant case, this difficulty is circumvented, as the range of issues for which the plaintiff may have become a public figure need not be confined to the alleged mismanagement. Rather, it is the management and operation, including any potential mismanagement, that are of concern to the public.

4. Indeed, a municipality's designation of a publicly owned auditorium for cultural events for the local population will transform the auditorium into a public forum for purposes of first amendment restrictions on regulation of content. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975); *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 569, (9th Cir.1984) *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985).

finds that there is a certain amount of assumption of the risk that runs concomitant with the plaintiff's former position, particularly given the relation of his position to the entertainment industry, which inevitably draws media attention.[5]

Thus, the three strains of the *Kassel* analysis weigh in favor of finding the plaintiff to be a public figure on issues relative to the Auditorium. Many decisions in which administrative and/or local governmental functions were implicated bolster this analysis.[6] These holdings are highly fact-specific, and each decision stands on its own circumstances. Obviously, the plaintiff in the instant case has not invited the same degree of scrutiny as one who has run for election or is employed in as controversial an area as law enforcement. The controlling rationale, however, is broader. In the governmental setting, public officials are "those ... who have or appear to the public to have, substantial responsibility for or control over the conduct of govern-

mental affairs ..." and whose "position ... has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees...." *Rosenblatt*, 383 U.S. at 85–86, 86 S.Ct. at 676. The record indicates that the plaintiff falls within this rationale, and he has done little to persuade this Court otherwise. His management position distinguishes this case from those whose relations with governance are ministerial or attenuated. *Compare Hutchinson*, 443 U.S. at 135, 99 S.Ct. at 2688 (applicant for federal funding for research was not a public figure); *Kassel*, 875 F.2d at 941 (plaintiff with non-supervisory position at Veterans' Administration hospital was not a public figure).

Furthermore, to the extent that the plaintiff's position had somewhat less leaning for the limelight and may not have occupied the plaintiff full-time, this Court finds *Continen-*

---

**5.** One of the plaintiff's exhibits is a letter of protest to Gary Bongiovanni of Pollstar. In this letter, the plaintiff recounts his "seven years with the NFL," his "seven years with the Boston Garden and the Bruins" and his time running a civic center and sports arena in Portland. Plaintiff's Exhibit 8, at 4. Clearly the plaintiff was no naif in these matters and could be expected to understand that the operation of a local auditorium will often draw attention.

**6.** *See St. Amant v. Thompson*, 390 U.S. 727, 730 & n. 2, 88 S.Ct. 1323, 1325 & n. 2, 20 L.Ed.2d 262 (1968) (deputy sheriff was public official); *New York Times*, 376 U.S. at 283 & n. 23, 84 S.Ct. at 727 & n. 23 (city commissioner was public official); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1431 (8th Cir.1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774, *reh'g denied*, 494 U.S. 1013, 110 S.Ct. 1312, 108 L.Ed.2d 488 (1990) (agent of Federal Bureau of Investigation was public figure); *Coughlin v. Westinghouse Broadcasting and Cable Inc.*, 780 F.2d 340, 342 (3rd Cir.1985) (police officer was public official); *Garcia v. Board of Education of Socorro Consolidated School District*, 777 F.2d 1403, 1408 (10th Cir.1985), *cert. denied*, 476 U.S. 1187, 106 S.Ct. 2927, 91 L.Ed.2d 554 (1986) (members of school board were public officials); *McKinley v. Baden*, 777 F.2d 1017, 1021 (5th Cir.1985) (police officer was public official); *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) (same); *Meiners v. Moriarity*, 563 F.2d 343, 352 (7th Cir.1977) (federal drug enforcement agents were public official); *Pape v. Time, Inc.*, 354 F.2d 558, 560 (7th Cir.1965), *cert. de-*

*nied*, 384 U.S. 909, 86 S.Ct. 1339, 16 L.Ed.2d 361 (1966) (plaintiff holding positions of deputy chief of detectives and lieutenant of police was public official); *Smith v. Turner*, 764 F.Supp. 632, 641 (N.D.Ga.1991) (chairman of county board of tax assessors was public figure); *Peeler v. Spartanburg Herald–Journal Division of the New York Times Co.*, 681 F.Supp. 1144, 1147 (D.S.C.1988) (candidate for school board was public official); *Murray v. Bailey*, 613 F.Supp. 1276, 1279–80 (N.D.Cal.1985) (assistant district attorney was public official); *Karr v. Townsend*, 606 F.Supp. 1121, 1131 (W.D.Ark.1985) (deputy sheriff was public official); *Moorhead v. Millin*, 542 F.Supp. 614, 618 (D.V.I.1982) (appointee to position of Director of the Division of Utilities and Sanitation of the Virgin Islands Department of Public Works was public official); *Fadell v. Minneapolis Star & Tribune Co.*, 425 F.Supp. 1075, 1082 (N.D.Ind.1976), *aff'd*, 557 F.2d 107, 108 (7th Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 452 (1977) (town tax assessor was public official); *see also Stone, supra*, 367 Mass. at 864–65, 330 N.E.2d at 171–72 (remanding for consideration of whether plaintiff, who was school employee and member of redevelopment authority, was public official); *Cf. Continental Cablevision, supra*, 653 F.Supp. at 460 (cable television company became public figure by obtaining local licenses, given importance of licensing procedure to public); *National Ass'n of Government Employees, Inc. v. Central Broadcasting Corp.*, 379 Mass. 220, 230 n. 12, 396 N.E.2d 996, 1002 n. 12 (1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980) (public employee union was "public figure of limited range as [a] matter of law").

*tal Cablevision* instructive. There, the court found that, by obtaining a cable television license, a corporation had thrust itself into interaction with a government agency on a matter of sufficient public importance to make the corporation a public figure. *Continental Cablevision, supra,* 653 F.Supp. at 461. In the instant case, the plaintiff was directly involved in affairs of municipal governance of analogous concern to the public, albeit in a somewhat limited fashion. There is no reason, however, that the plaintiff's limited public figure status cannot be appropriately circumscribed. *Cf. Crane v. Arizona Republic,* 972 F.2d 1511, 1524–25 (9th Cir. 1992) (private attorney who formerly headed federal strike force was public official only with respect to allegations relating to conduct while prosecutor). Accordingly, this Court finds that the plaintiff is a public figure limited to the range of issues arising from his position with the Auditorium.

## VI. MALICE AND TRUTH

The determination that the plaintiff is a limited public figure necessitates an exposition of the standards for finding defamatory matter concerning limited public figures to be actionable. As noted, the central concepts are those of "actual malice" and "truth." A brief exegesis follows.

### A. *Truth*

The first amendment's intrusion into the common law of defamation has affected the way the issue of truth is litigated. At least where issues of public concern are involved, the Constitution does not countenance liability in a defamation suit for true statements. *See Time, Inc. v. Firestone, supra,* 424 U.S. at 458, 96 S.Ct. at 967 (citing *Cox Broadcasting Co. v. Cohn,* 420 U.S. 469, 498–500, 95 S.Ct. 1029, 1047, 43 L.Ed.2d 328 (1975) (Powell, J., concurring)). This development affects the common law cause of action in that the Supreme Court has shifted the burden of establishing the falsity of the allegedly libelous speech to the plaintiff in instances where the speech is of public concern and the defendant is a member of the media. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776–78, 106 S.Ct. 1558, 1563–65, 89 L.Ed.2d 783 (1986). This holding places the burden of proof for the issue of falsity on the plaintiff in any instance where the defendant is a public figure or the issue is of public concern. *See* Smolla, *supra,* § 5.07.

This placement of the burden is not insignificant, for truth and falsehood do not bear an exact demarcation in the constitutional jurisprudence of libel. If a statement is substantially true, minor inaccuracies will not support a recovery. Furthermore, editorial or literary embellishments do not make true statements false. *See Ryan v. Brooks,* 634 F.2d 726, 733 (4th Cir.1980). The Supreme Court recently went so far as to hold:

> We conclude that a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of *New York Times Co. v. Sullivan,* 376 U.S., at 279–280, 84 S.Ct., at 725–726 and *Gertz v. Robert Welch, Inc., supra,* 418 U.S., at 342, 94 S.Ct., at 3008, unless the alteration results in a material change in the meaning conveyed by the statement.

*Masson v. New Yorker Magazine,* 501 U.S. 496, 516, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991). As Judge Zobel has observed: "A fussy insistence upon literal accuracy 'would condemn the press to an arid, desiccated recital of bare facts.'" *Loeb v. Globe Newspaper Co.,* 489 F.Supp. 481, 486 (D.Mass.1980) (quoting *Time, Inc. v. Johnston,* 448 F.2d 378, 384 (4th Cir.1971)).

### B. *Actual Malice*

The term "actual malice" denotes "publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity." *Masson,* 501 U.S. at 511, 111 S.Ct. at 2430. This standard provides more protection to publishers than a mere negligence standard, in that a publisher of a false statement may not be liable even if a reasonably prudent person would have refrained from publishing or would have investigated further before publishing. Rather, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant, supra,* 390 U.S. at 731, 88 S.Ct. at 1325.

Whether a defendant published a statement with knowledge or reckless disregard of its falsity is a question of fact. *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326.

> The defendant ... cannot ... automatically insure a favorable verdict by testifying that he published with a belief that the statements were true.... Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Id.* Nevertheless, "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." *Gertz,* 418 U.S. at 332, 94 S.Ct. at 3003. "There must be some evidence of subjective suspicion that further investigation is needed." Smolla, *supra,* § 3.17[1], at 3–40.2. Merely failing to check the accuracy of information with sources within a defendant's own files is, alone, not enough to demonstrate actual malice. *New York Times,* 376 U.S. at 287, 84 S.Ct. at 730.[7] The defendant must have acted with a "high degree of awareness of ... probable falsity." *Gertz,* 418 U.S. at 332, 94 S.Ct. at 3003 (quoting *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325). "[I]naccuracies brought to the attention of the publisher after publication are not relevant to the publisher's state of mind before publication." *Herbert v. Lando,* 781 F.2d 298, 309 (2d Cir.1986), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986) (citations omitted). "Moreover, behavior such as the refusal to publish dissenting points of view is not alone sufficient to support an allegation of actual malice before publication." *Id.*

One factor salient to the instant case is the centrality of any inaccurate statements to the theme and purpose of the article as a whole. If there is no actual malice with regard to the bulk of the assertions and with regard to the general thrust of an article, inaccuracies with regard to subsidiary matters will not support recovery. *Herbert,* 781 F.2d at 311–12. In other words, if the inference to be drawn from a statement containing minor inaccuracies is itself nonactionable, the existence of minor inaccuracies that point only to the same inference will not give rise to a finding of actual malice. *Id.*

Another factor this Court will look to is whether the information received by the defendants facially exhibited any "inherent improbability." Smolla, *supra,* § 3.13[3], at 3.33. Thus, a finding of actual malice may be inappropriate if the information was internally consistent and came from a source with the indicia of trustworthiness and competence. *See Curtis Publishing Co., supra,* 388 U.S. at 158–59, 87 S.Ct. at 1993. In this case, the source of the information was a newspaper article in the Lowell Sun, necessitating an examination of the rules of republication.

That the articles in question may be republications will not, in and of itself, relieve the defendants from liability. A republisher is liable for a defamatory statement as if it was an original publication. *See* Nolan & Sartorio, *supra,* § 128. "This rule does not, however, excuse the plaintiff in a case such as this one from making the constitutionally required showing of fault on the part of the publisher." *Appleby v. Dailey Hampshire Gazette,* 395 Mass. 32, 36, 478 N.E.2d 721, 724 (1985). Thus, although an original publication and a republication are equally susceptible to triggering liability, the fact of republication may affect the fault calculus. For instance, in *Appleby,* the SJC upheld a ruling that "the verbatim republication from a reputable wire service could not, as a matter of law, constitute negligence, unless the article appears, on its face, to be inherently improbable." *Id.,* 395 Mass. at 36, 478 N.E.2d at 724. This holding derives from the prohibi-

---

7. It is, however, possible that a "failure to verify a story by checking an obvious and accessible source may be so suspicious as to create an inference that the defendant in fact entertained serious doubts and intentionally avoided verification for fear that it would contradict the story the defendant was about to publish." Smolla, *supra,* § 3.18[1], at 3–42.

tive expense and burden that would accompany a duty to make independent verification and from the difficulty in distinguishing between verifiable and nonverifiable wire stories, as well as from the reliability of the wire services. *Id.,* 395 Mass. at 38–39, 478 N.E.2d at 725–26.

The holding in *Appleby* is consistent with a rule protecting republication from wire services. *See, e.g., Waskow v. Associated Press,* 462 F.2d 1173, 1176 (D.C.Cir.1972). Protection for republication, however, has not been rigorously circumscribed within the wire service context. *See Auvil v. CBS 60 Minutes,* 800 F.Supp. 928, 931–32 (E.D.Wash.1992) (local broadcaster not liable for carrying network broadcast absent showing of fault); *Cubby, Inc. v. CompuServe Inc.,* 776 F.Supp. 135, 139–40 (S.D.N.Y.1991) (computerized data library not liable for disseminating libelous publications absent showing of fault); *Washington Post Co. v. Keogh,* 365 F.2d 965, 972–73 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967) (newspaper not liable for printing of libelous syndicated column absent showing of "good reason to suspect falsity"). According to the rationale governing these case, "one who only delivers or transmits defamatory matter published by a third person is subject to liability if, but only if, he knows or had reason to know of its defamatory matter." *Dworkin v. Hustler Magazine, Inc.,* 634 F.Supp. 727, 729 (D.Wyo.1986) (quoting *Restatement (Second) of Torts* § 581).

For the actual malice question to reach the jury, the plaintiff must indicate an ability to "produce the requisite quantum of evidence...." *Dexter's Hearthside Restaurant, Inc. v. Whitehall Co.,* 24 Mass.App.Ct. 217, 223, 508 N.E.2d 113, 118, *review denied,* 400 Mass. 1104, 511 N.E.2d 620 (1987). The quantum of proof required for actual malice is clear and convincing evidence. *Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008. Thus, to escape the summary judgment guillotine, the plaintiff must present affirmative evidence from which this Court could conclude that a reasonable jury would find actual malice by clear and convincing evidence. *Anderson,* 477 U.S. at 254–57, 106 S.Ct. at 2513–15. The plaintiff's factual adduction must point to "evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." *Bose Corp. v. Consumers Union of United States,* 692 F.2d 189, 192 (1st Cir.1982), *aff'd,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502, *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3561, 82 L.Ed.2d 863 (1984).

## VII.  THE FACTUAL ADDUCTIONS

In light of these standards, this Court shall assay the allegedly defamatory statements. This Court scrutinizes the statements first for truth and second for actual malice.

### A.  *Truth*

#### 1.  *Seizure of Records*

The first article states that the city auditor "seized the financial records" of the Auditorium. Defendants' Exhibit B. At his deposition, the plaintiff stated: "I didn't see any seizing." Defendants' Exhibit I, at 7. Rather, according to the plaintiff "copies of the ... accounts [were] ... sent down to City Hall for the Auditor." *Id.* "[E]ventually [the auditor] had copies of all the records under his control." *Id.* at 8. Furthermore, the plaintiff stated that it was his understanding that the city auditor obtained possession of the financial records of the Auditorium. *Id.* This adduction satisfies the defendants' burden, as to the alleged falsity of this statement, of pointing to an absence of evidence in support of the plaintiff's case. Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

The plaintiff responds by pointing to his own deposition testimony intimating his cooperation with the city auditor and the city treasurer. Plaintiff's Exhibit 3, at 10. The plaintiff argues that the word "seize" implies a taking by force against the plaintiff's will. The plaintiff's evidence, however, while intimating some cooperation, in no way indicates that there was no seizure of the records.

The plaintiff also offers his own statement, by way of affidavit, that the city auditor did not seize the records. Plaintiff's Exhibit 3, at 1. The plaintiff's own statement, however, is a thin reed on which to support his burden of adduction. Falsity is an issue on which

the plaintiff bears the ultimate burden of proof. In light of that burden, the plaintiff's summary judgment adduction simply fails to present evidence from which a jury could conclude that there was no seizure, leaving no genuine issue of material fact. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

### 2. *Frozen Spending*

The first article also states that the city auditor "froze the spending" of the auditorium. Defendants' Exhibit B. To discharge its burden, the defendants point to the plaintiff's deposition testimony in which he states in response to a question as to whether the city auditor froze the spending of the Auditorium: "If my understanding of freezing the spending is that he [the city auditor] stopped any further use of the checking account that we used at The Auditorium, then that is correct. They opened a new account for the purposes of continued activities at The Auditorium." Defendants' Exhibit I, at 9. The defendants also point to a conflict in the plaintiff's testimony. The plaintiff testified on deposition that "[t]he spending procedures weren't changed at all." *Id.* at 10. The plaintiff then stated that "[t]he procedures were altered." *Id.* at 11. Thus, as to the issue of the alleged falsity of the frozen spending, the defendants have pointed to a lack of evidence in support of the plaintiff's case. Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

The plaintiff argues that the city auditor took control of a check-book that was independent of a municipal account that constituted the Auditorium's operating budget. The plaintiff contends that the latter was not frozen. The plaintiff points to the deposition testimony of John Reilly distinguishing these accounts and stating that, in his memory, the municipal account was not frozen. Plaintiff's Exhibit 5, at 24, 40–41. The plaintiff also offers his affidavit statement that the spending was not frozen. Plaintiff's Exhibit 3, at 1.

Ultimately, this Court finds the plaintiff's deposition testimony damning on this issue. The plaintiff has suggested a plausible interpretation of the events in question, using the characterization "freezing the spending."

The plaintiff has also pointed to many nuances that this phrase does not capture, but, as noted, the standard for truth is not so rigorous. *See Loeb,* 489 F.Supp. at 486. Rather, the first amendment provides leeway for plausible interpretations that may not capture all of the multifaceted complexities of human reality. In the face of the plaintiff's burden of persuasion by clear and convincing proof, the plaintiff's adduction falls short. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514.

### 3. *Quotations and Attributions*

The first article attributes several statements to the plaintiff and to Jack Reilly. In his deposition testimony, the plaintiff stated: "I do not feel that I was misquoted...." Defendants' Exhibit I, at 15. He further testified that the article was accurate in stating his acknowledgment of the missing money and qualifying the statement with his questioning of the amount. *Id.* at 22. He also testified that he had been aware of a fund-related problem since late in 1987. Defendants' Exhibit I, at 28. Finally, the plaintiff admitted in his deposition testimony the accuracy of quotations attributed both to him and to Jack Reilly. Defendants' Exhibit I, at 56–59. These admissions cover the statement about $35,000 owed to the Auditorium by Rick Starr and Starr's purported loss of over $100,000 on shows at the Auditorium. They also cover statements attributed to the plaintiff, which doubted the accuracy of the amount of missing money and which expressed his awareness of the financial problems in the past fall. As to the quotation attributed to Jack Reilly, stating that there was no evidence of dishonesty but was evidence of "stupidity," the plaintiff admitted his lack of knowledge as to its validity, qualified by his knowledge that Reilly did not in fact feel that stupidity was at the core of the turmoil. In light of this adduction, this Court finds that the defendants have satisfied their Rule 56(c) burden of demonstrating an absence of evidence on the issue of the truth or falsity of these statements. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. This Court finds that the plaintiff has not rebutted this showing, leading to a further finding of

no genuine issue of material fact on the accuracy of the quotations and attributions.

### 4. *Hiring of Friend*

The first article states that the plaintiff was accused of "hiring a personal friend and paying her $25,900 to help market the venue. . . ." Defendants' Exhibit B. At his deposition, the plaintiff testified that he did indeed hire a friend to help market the venue. When asked whether he paid her $25,900, he responded that he was "not sure of that figure." Defendants' Exhibit I, at 36. Thus, the defendants have discharged their burden under Rule 56(c) of pointing to an absence of evidence in support of the plaintiff's case on the truth or falsity of this statement. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. The plaintiff has not pointed to evidence to the contrary, and, accordingly, this Court finds no genuine issue of material fact.

### 5. *Receipts and Rent*

The first article discusses $157,000 in missing receipts and states:

> Of the missing $157,000, about $106,000 is due the city for rent and concessions funds; the city received no payments from March of 1987 until The Sun began asking questions last month despite the fact that the auditorium's $500,000 operating budget is paid by the city and the venue has few other expenses.

Defendants' Exhibit B. At his deposition, the plaintiff testified that the city did not receive any funds from the Auditorium from March of 1987 through approximately March of 1988. Defendants' Exhibit I, at 50–52. This showing suffices to discharge the defendants' burden. Fed.R.Civ.P. 56(c).

The plaintiff argues that, because approximately $42,000 had been paid to Lowell for rents and concessions by April 11, 1988, the figure of $106,000 is not accurate. The plaintiff denies the $106,000 amount in his affidavit. Plaintiff's Exhibit 3. The plaintiff also offers his own deposition testimony to the effect that the city received $42,000. Plaintiff's Exhibit 4, at 24. This evidence is self-serving and not the type that would permit a

fair-minded jury to find in favor of the plaintiff. *Mack*, 871 F.2d at 181.

The plaintiff expends considerable energy finding fault with the $157,000 figure for the missing receipts and with the statement that receipts were missing. Much of this attack consists of the plaintiff's own conclusory testimony. Plaintiff's Exhibit 3; Plaintiff's Exhibit 4, at 25. The plaintiff also claims that, if the defendants had read the entire Lowell Sun article of March 23, 1988, from which the defendants had gathered their information, the falsity of the $157,000 figure would be apparent. Plaintiff's Exhibit 6. The plaintiff is correct that this article provides a possible explanation for a portion of the $157,000, although it also states that $157,000 was unaccounted for. The plaintiff also points to the deposition testimony of John Reilly disputing the $157,000 figure and claiming that an audit "showed something in the $80,000 range. . . ." Plaintiff's Exhibit 5, at 24, 29. Accordingly, the truth of this figure and whether it derives from missing receipts are legitimately in dispute, and this Court shall revisit the issue below in the "actual malice" context. As to the other issues raised here, this Court finds no genuine fact issue.

### 6. *Second Article*

The second article, of January 16, 1989, states that the investigation into the financial affairs of the Auditorium "has intensified."

> The local probe into the financial affairs of the **LOWELL MEMORIAL AUDITORIUM** in Lowell, MA has intensified. Following an audit, the city manager called in the district attorney's office to further investigate the municipal facility's operation for any criminal violations that may have occurred. Also following the audit, City Manager James Campbell fired auditorium managing consultant **JACK NICHOLSON** for alleged financial mismanagement. Although one maintenance and one custodial employee have been charged with improprieties, no criminal charges have been filed against Nicholson. . . .

Defendants' Exhibit C (emphasis in original). The plaintiff testified on deposition that "[t]here was no intensification whatsoever." Defendants' Exhibit I, at 62. He admitted

that his contract was terminated. *Id.* at 63. He admitted that the city manager did call the district attorney's office in regard to a potential criminal investigation. *Id.* at 65. As to other statements in this article, the plaintiff either admitted their truth or testified to his lack of knowledge. *Id.* at 65–66. The defendants also point to the deposition testimony of city auditor James Kennedy. He testified that he referred the matter to the Lowell Police Department, who referred it to the Inspector General, who in turn referred it to the District Attorney. Defendants' Exhibit J, at 26–29. He also testified that an Assistant District Attorney had the audit report for the Auditorium. *Id.* at 31.

In response, the plaintiff offers his own statements that the investigation did not intensify. Plaintiff's Exhibit 3; Plaintiff's Exhibit 8; Plaintiff's Exhibit 4, at 62–63. He also points to the deposition testimony of Jack Reilly. Mr. Reilly testified at first that he had no comment as to whether the probe intensified as of January 16, 1989. Plaintiff's Exhibit 5, at 55. He then testified that the events of late October and early November of 1988, including the issuance of an independent auditor's report and the termination of the plaintiff, brought the matter to an end. *Id.* at 55–56. The second article was released on January 16, 1989. The plaintiff argues that the use of the words "called in" to describe the district attorney's entry into the events, combined with the use of the word "intensified" creates an improper impression of criminal wrongdoing on the part of the plaintiff.

The article explicitly disclaims any charge of criminal impropriety against the plaintiff. Defendants' Exhibit C. Furthermore, there seems to be no question as to the propriety of using the words "called in" to describe the district attorney's entry into events. *Cf. Ryan,* 634 F.2d at 733 (providing historian leeway for interpretation of facts). As to most of the statements in this article, this Court finds no genuine issue of material fact on the issue of truth or falsity. Nonetheless, this Court finds that a fact issue remains on the question of whether the use of the term "intensified" was a defamatory falsehood. Given Mr. Reilly's testimony that the investigation had terminated prior to publication of the second article, this Court cannot conclude that a fair minded jury could not find the use of the word "intensified" to be false. Accordingly, this Court must examine this issue below through the lens of "actual malice."

### 7. *Emphasis Added*

The plaintiff challenges the defendants' use of enlarged print to emphasize certain words and phrases. As noted, the use of literary embellishments is entirely permissible. *Ryan,* 634 F.2d at 733; *Loeb,* 489 F.Supp. at 486. If the Supreme Court permits the alteration of quotations, provided there is no material change in meaning, *Masson,* 501 U.S. at 516, 111 S.Ct. at 2433, considerable leeway must similarly be accorded to allow emphasis of words and phrases. As noted, there is an issue as to the truth of the assertion that receipts were missing. Emphasis of the words "missing receipts" adds little to this Court's calculus. The other emphasized words and phrases do not in any way alter the facts. Accordingly, this Court does not find a genuine issue of material fact by virtue of the emphasized words and phrases. *See also Herbert,* 781 F.2d at 309 n. 8 (article's graphics and prefatory "streamer" do not provide independent basis of liability).

### B. *Actual Malice*

What remains actionable after this Court's scrutiny for truth is readily intercepted when viewed through the lens of "actual malice." This Court cannot discern how a reasonable jury could find by clear and convincing evidence that the defendants entertained serious doubts as to the validity of the assertions in their articles. The record does not contain the requisite quantum of evidence. To the contrary, what evidence there is tends to undercut the plaintiff's case, rather than support it.

As this Court found above, many of the statements contained in the two articles were substantially true. There is some evidence of possible falsity in the statements regarding the $157,000 in missing receipts and in the characterization of the investigation as intensification. Viewing the record in the light most favorable to the plaintiff, however,

the evidence, at best, might support an inference of slight negligence in not providing a more careful breakdown of the monetary figure in question and in not checking the facts on the status of the investigation. Furthermore, any minor inaccuracies do not support an inference materially different from that which this Court finds true and nonactionable—that some type of mismanagement or fiscal impropriety is likely to have occurred on the plaintiff's watch.[8] *See Herbert,* 781 F.2d at 311–12. The plaintiff's letter disputing the statements in the first article [9] in no way casts doubt on the defendants' motives, as the letter is subsequent to that article. *Id.* at 309. Furthermore, the defendants had no duty to present the plaintiff's point of view. *Id.* Ultimately, the plaintiff presents no substantial evidence casting doubt upon the defendants' motives or calling into question their source.[10] *See Cubby, Inc., supra,* 776 F.Supp. at 139–40; *Washington Post Co., supra,* 365 F.2d at 972–73; *Appleby,* 395 Mass. at 36; 478 N.E.2d at 724. *See also Geiger v. Dell Publishing Co., Inc.,* 719 F.2d 515, 517–18 (1st Cir.1983) (publishers' failure to check veracity of book author's allegedly defamatory statements by contacting plaintiff before publishing book was not "grossly irresponsible" so as to trigger liability for defamation under New York law). The plaintiff's adduction is, at best, of such minor inaccuracies as to leave this Court no margin to determine that a fair minded jury could find clear and convincing evidence in support of a finding of deliberate or reckless disregard on the part of the defendants. Accordingly, no genuine issue of material fact exists, and entry of summary judgment in favor of the defendants is appropriate.

8. Indeed, the second article explicitly notes that the plaintiff was not charged with criminal wrongdoing. Plaintiff's Exhibit 2.

9. Plaintiff's Exhibit 8.

10. The plaintiff does contend that defendant Gary Bongiovanni had promised, following the first article, that any subsequent story would be verified with a call to the plaintiff, a promise that was not fulfilled. In support, the plaintiff submits two letters he had sent to defendant Bongiovanni alluding to such a promise. Plaintiff's Exhibits 7 & 8. Any such promise in no way

## VIII. CONCLUSION

In light of the above, this Court first finds that the plaintiff is a limited public figure for issues relating to his bailiwick at the Auditorium, triggering the heightened protections of the *New York Times* standard under the first amendment. Within these strictures, this Court finds many of the statements in the article to be nonactionable on the basis of their substantial truth and the remainder of the article to be nonactionable for failure to meet the actual malice test. In an instance such as this case, the use of the summary judgment mechanism to require the plaintiff to demonstrate evidentiary support for his claim has the salutary effect of safeguarding the first amendment value of free speech. *See* Martin B. Louis, *Summary Judgment and the Actual Malice Controversy in Constitutional Defamation Cases,* 57 So.Cal. L.Rev. 707 (1984). Thus, a determination that the record does not contain the quantum of evidence necessary to meet the first amendment's strictures does not in any way pass judgment on the plaintiff's treatment. As James Madison argued: "Some degree of abuse is inseparable from the proper use of everything; and in no instance is this more true than in that of the press." 4 Jonathan Elliot, *Debates on the Federal Constitution of 1787,* at 571 (1876). The answer lies in countervailing speech through the marketplace of ideas, rather than through chilling interpretations of defamation laws. In the words of Thomas Jefferson: "We have nothing to fear from the demoralizing reasonings of some, if others are left free to demonstrate their errors ... these are safer corrections than the conscience of a judge." *quoted in Whitney v. California,* 274 U.S. 357, 375 n. 2, 47 S.Ct. 641, 647–48 n. 2, 71 L.Ed. 1095

affects the defendants' motives with regard to the first publication. With regard to the second publication, the evidence does not support a finding of actual malice. As noted, the defendants did not have to publish the plaintiff's views. Calling the plaintiff to verify might have led to independent sources to provide legitimate verification, but the failure to do so, at most, arises to a level of slight negligence. There is no showing of anything that legitimately should have called into question the validity of the defendants' source prior to publication. The plaintiff can be expected to have disapproved of the coverage.

(1927) (Brandeis, J., concurring). Accordingly, this Court recommends that the defendants' motion for summary judgment be granted.

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).