Gary A. BENNETT and Elizabeth Bennett, Plaintiffs

v.

CITY OF HOLYOKE, Daniel Szostkiewicz, individually, and in his official capacity as Mayor of the City of Holyoke, Marc Cournoyer, individually, and in his official capacity as Chief of Police for the City of Holyoke Police Department, Stephen Donoghue, and Arthur Therrien, Defendants

No. CIV.A. 99–30015–MAP.

United States District Court, D. Massachusetts.

Nov. 7, 2002.

Tani E. Sapirstein, Sapirstein & Sapirstein, Springfield, MA, for Plaintiffs.

Harry L. Miles, Geoffrey B. White, John J. Green, Jr., John H. Fitz–Gibbon, Green, Miles, Lipton, White & Fitz–Gibbon, John C. Sikorski, Robinson, Donovan, Madden & Barry, Michael R. Salvon, National Association of Government Employees, Springfield, MA, for Defendants.

### MEMORANDUM REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(Docket No. 78)

PONSOR, District Judge.

#### I. *Introduction*

Plaintiff Gary A. Bennett ("Bennett"), a former sergeant with the City of Holyoke Police Department and his wife, plaintiff Elizabeth Bennett (together with Bennett, "plaintiffs"), have brought a nine-count lawsuit, asserting the following claims: violation of the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185 (Count One); violation of the Massachusetts Anti–Discrimination Act, Mass. Gen. Laws ch. 151B (Count Two); violation of the Massachusetts Privacy Act, Mass. Gen. Laws ch. 214, § 1B (Count Three); violation of both the federal civil rights statute, 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act, Mass. Gen Laws ch. 12, § 11I (Count Four); common law breach

of contract (Count Five); common law intentional infliction of emotional distress (Count Six); common law intentional interference with contractual relations (Count Seven); common law defamation (Count Eight); and, by Elizabeth Bennett, loss of consortium (Count Nine). The targets of the lawsuit are Bennett's former employer, the City of Holyoke; Daniel Szostkiewicz ("Szostkiewicz"), the former Mayor of Holyoke; Mark Cournoyer ("Cournoyer"), the former Chief of Police of the Holyoke Police Department; Stephen Donoghue ("Donoghue"), another former Chief of Police of the Holyoke Police Department; and one of Bennett's former coworkers, Arthur Therrien ("Therrien") (together "defendants").

In essence, the plaintiffs contend that, because Bennett attempted to expose certain allegedly corrupt practices in the Holyoke Police Department, Bennett has suffered harassment and retaliation in violation of his statutory and common law rights.

Defendants have moved for summary judgment on all counts. The court on October 17, 2002 issued a summary memorandum setting forth rulings in which the motion was allowed, in part; this memorandum will amplify the court's reasoning in preparation for the trial, now scheduled to commence on November 12, 2002. Counsel should take note that in this memorandum the court has also, on closer reflection, somewhat modified the rulings set forth in the short October 17 memorandum.

## II. Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R.Civ.P. 56(c).* A "genuine" issue is one that reasonably could be resolved in favor of either party, and a "material" fact is one that affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"[T]he district court must view 'the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor.'" *Bienkowski v. Northeastern Univ.,* 285 F.3d 138, 140 (1st Cir.2002), quoting *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995), *cert. denied,* 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996).

Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995), *aff'd,* 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). Rule 56(e) requires the opposing party to meet this burden with admissible evidence. "Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment." *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). Likewise, "the First Circuit will reject responses by nonmovants that adduce statements not based on personal knowledge or that adduce conjectural or conclusory allegations." *Nicholson v. Promotors on Listings,* 159 F.R.D. 343, 348 (D.Mass.1994).

## III. Factual and Procedural Background

The facts below are viewed in the light most favorable to the plaintiffs; all reasonable inferences are drawn in their favor.

In January 1999, after twenty-one years as an officer (including seven years as a sergeant), Bennett's tenure as a member of the Holyoke Police Department came to an end. The record reflects that his years of employment featured a number of con-

flicts with fellow officers and superiors, as well as episodes of misconduct leading to discipline. Four of these will be mentioned in the discussion below and should be noted: (1) domestic disputes leading to the issuance of a restraining order against Bennett, served by fellow officers at the request of his wife, in the mid–1980's; (2) the 1988 "Monarca" incident, in which Bennett was criminally charged (and acquitted after a highly-publicized trial) with being involved in placing a firecracker in a cigarette that exploded in a juvenile inmate's face; (3) the "Dunn" altercation in which a citizen's complaint was filed charging that Bennett, while in civilian clothes, banged on the hood of the complainant's car, opened the passenger door and screamed obscenities at the occupants; and (4) the "O'Brien" altercation in 1993, in which a citizen's complaint was filed and Bennett was disciplined following a barroom fight in which Bennett punched another patron five or six times in the face.

The events which give rise to the present lawsuit began in August 1996, when Bennett became eligible for promotion to the rank of lieutenant. Of all candidates, Bennett had achieved the highest score on the promotional exam. Around this time, another officer, Louis Flores ("Flores"), informed Bennett that then-Chief Donoghue had disclosed contents of Bennett's personnel files to defendant (later Chief) Cournoyer in order, in some way, to undermine Bennett's prospects of promotion. According to what Flores told Bennett, Donoghue's primary motivation was to insure promotions only of those officers who would not interfere with his corrupt practices such as illegal liquor sales and gambling.

Following the conversation with Flores, Bennett sent an email dated September 10, 1996 to Cournoyer, who was at that time Secretary/Treasurer of International Brotherhood of Police Officers Local Number 408. The email stated that unspecified "reliable sources" had revealed Cournoyer's complicity in a plot to "manufacture a reason to undermine [Bennett's] candidacy for an upcoming promotion." (Docket 86, Exhibit 7). Bennett reminded Cournoyer of his duty as a union officer to "protect [Bennett's] rights and act in [Bennett's] best interest." *Id.* The correspondence concluded with the following language:

> The only reason I would not be selected would be as a result of activity which should not be part of the selection process. In that case anyone who would interfere with my ability to better provide for my family could expect the severest response possible to the fullest extent imaginable.

*Id.*

Believing the email constituted a physical threat, Cournoyer wrote a letter dated September 11, 1996 to Donoghue describing Bennett's propensity for violence (including references to the incidents described above) and expressing concern for his own, and his family's, well-being. Plaintiff alleges that Donoghue had given Cournoyer access to Bennett's personnel file, so that Cournoyer could obtain damaging private information about Bennett and include it in the September 11 letter.

In response to Cournoyer's letter, on September 17, 1996, Donoghue summoned Bennett into his office where, in the presence of Cournoyer and Donoghue's assistant Alan Fletcher, Donoghue allegedly pressured Bennett to reveal the identity of Bennett's informant and the specific nature of the information he had received. Bennett refused.

On September 29, 1996, Bennett wrote a followup letter to Donoghue defending the original September 10 email and asserting that the content of Cournoyer's letter "confirmed the accuracy and reliability of [Bennett's] information by presenting . . .

exactly the unfavorable report [that Bennett] had been advised about." (Docket 86, at 7). On October 2, 1996, Donoghue responded with a letter of reprimand, which, according to Donoghue, brought closure to "just another example of [Bennett's] aberrant behavior." (Docket 86, Exhibit 12). The letter was placed in Bennett's personnel file. On October 16, 1996, Donoghue summarily denied a grievance filed by Bennett regarding the October 2 letter of reprimand.

At around this same time, in September of 1996, Bennett filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") relating to an incident where Cournoyer had allegedly used threatening language against an officer Jorge Rodriguez ("Rodriguez"), an episode that Bennett believed to reflect Cournoyer's bias against Puerto Ricans.

A little later in the fall of 1996, Bennett commenced his own informal investigation of the Holyoke Police Department in collaboration with fellow Sergeant Robert Wagner ("Wagner"). The two sergeants closely examined filings of arrest reports to corroborate suspicions of departmental abuses by Cournoyer and Donoghue, among others. Bennett and Wagner shared their findings with the state Attorney General's office, whose own investigation of the Holyoke Police Department was apparently under way. According to Bennett, the two met with members of the Attorney General's office on roughly six occasions between late 1996 and 1998 and were directed to acquire further evidence of corruption.

On October 16, 1996, Donoghue disciplined Bennett for failure to comply with Holyoke Police Department Standing Operating Procedure Number 6.5 ¶¶ D–E (for complaining to an outside agency) and Departmental Regulation 1.60 (for "impair[ing] the operation and efficiency of the department"). The letter of repri-

mand asserted that Bennett's act of filing the September 1996 MCAD complaint violated these provisions and, moreover, that the complaint was filed without Rodriguez's knowledge or consent. On November 14, 1996, Bennett amended his own MCAD complaint to allege a charge of retaliation rising from the October 16, 1996 discipline. In other words, he charged employment discrimination against himself, in the form of retaliation for having complained about discrimination against Rodriguez.

In December 1996, two positions for Lieutenant became available. Bennett was passed over. Donoghue and Szostkiewicz played prominent roles in the decision to give the promotions to other officers. Thereafter, Bennett again amended his MCAD complaint to include a charge of retaliation against him, expressed through this denial of promotion.

In January 1997, friction between Bennett and the Holyoke Police Department increased with the publication of a controversial article in a local newspaper, the Valley Advocate. The piece quoted Bennett at length with respect to alleged departmental abuses in overtime distribution, appropriation of community policing grants, treatment of minority workers, and theft.

On February 2, 1997, defendant Therrien, President of International Brotherhood of Police Officers Local Number 388, wrote a letter to acting Chief Russell Paquette calling for immediate disciplinary action against any officer violating departmental rules prohibiting public criticism of the Holyoke Police Department. On February 7, 1997, Bennett was reassigned to the post of community police supervisor, a slot typically reserved for junior sergeants. In a letter of reprimand dated March 3, 1997, Donoghue suspended Bennett for three days, finding that Bennett's role in

the Valley Advocate article had violated videpartmental regulations 1.6,[1] 1.24,[2] and 1.26.[3]

In response to Bennett's appeal of the discipline through the Civil Service Appeals procedure, Holyoke Mayor Szostkiewicz held a public hearing on March 10, 1997 and determined that this discipline should stand. Bennett had asked that the hearing be closed, but Szostkiewicz denied the request. As a result Bennett says certain confidential personnel information became public during the hearing.

Therrien later filed an internal complaint alleging that a document authored by Bennett forwarded to MCAD had accused Therrien of criminal wrongdoing and sexual discrimination. On April 30, 1998, newly-promoted Chief Cournoyer suspended Bennett for one day for violations of departmental regulations 1.24, 1.26, and 1.30,[4] and for language in Bennett's MCAD complaint "as it pertains to Officer Arthur Therrien." In response, Bennett filed a grievance asserting that Therrien's complaint was submitted beyond the fifty-day limit established by the union's collective bargaining agreement. Thereafter, Cour-

noyer reduced Bennett's discipline to a written reprimand.

Bennett was also disciplined for his conduct pertaining to some personnel documents of Eva O'Connell ("O'Connell")—one of two officers promoted to Lieutenant in December 1996—that Bennett claimed to have come across in a public filing cabinet. Purportedly in an effort to demonstrate disparate treatment of similarly situated officers, Bennett forwarded these documents to the MCAD and to the Massachusetts Labor Relations Commission. Then–Chief Cournoyer suspended Bennett for five days for "malicious dissemination of the[] documents." After the City of Holyoke denied Bennett's requests for a public hearing to appeal the discipline, he filed a complaint with the Civil Service Commission alleging that the City of Holyoke had failed to comply with applicable procedures by refusing to grant a hearing. Subsequently, the suspension was overturned and Bennett received an award of lost pay plus interest stemming from the O'Connell incident.

Bennett submitted a "Contractual Notice of Intent to Retire" ("Notice") on Sep-

---

1. Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably upon the Department. Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the Officer as a member or the Department, or that which impairs the operation or efficiency of the Department or officer.
(Docket 86, Exhibit 22, at 2–3).

2. Officers shall not publicly criticize or ridicule the Department, its policies, or other officers by speech, writing or other expression, where such speech, writing or other expression is defamatory, obscene, unlawful, is intended to undermine the effectiveness of the Department, is insubordinate, or is made with reckless disregard for truth or falsity.
(Docket 86, Exhibit 22, at 4–5).

3. A member or an employee of the Department shall not criticize any other member or

employee except in the line of duty as a superior to a subordinate, nor shall the member or employee maliciously gossip about any superior, order, policy, procedures, case or event, nor shall a member or employee cause to discredit, lower or injure the morale of the personnel of the Department or that of any individual of the Department.
(Docket 86, Exhibit 22, at 5).

4. Officers shall treat the official business of the Department as confidential. Information regarding official business shall be disseminated only to those for whom it is intended, in accordance with established departmental procedures. Officers shall not divulge the identity of persons giving confidential information except as authorized by proper authority.
(Docket 86, Exhibit 22, at 6).

tember 11, 1997. He now contends that this submission was only a ploy, reflecting a common practice within the police department, to allow him to receive pay without working by using accumulated sick leave. The applicable bargaining agreement apparently entitled a retiring employee to compensation for up to one hundred days of unused sick leave. After his submission of the Notice, Bennett received pay for over forty-two days of sick time, apparently permitting him to be paid without working.

On January 28, 1998, then-Mayor Szostkiewicz took Bennett at his word and notified Bennett of his formal acceptance of Bennett's retirement notice.[5] After learning that he would not actually become "retirement eligible" until January 23, 1999, Bennett requested and received an extension of his employment until that date.

On May 18, 1998, Bennett attempted to withdraw his Notice of Intent to Retire; this overture was denied by Cournoyer. As a result, Bennett's tenure with the Holyoke Police Department came to a close on January 23, 1999.

Throughout Bennett's final years of employment with the Holyoke Police Department and during the period leading to this litigation, Bennett and the defendants traded accusations through the press. Plaintiff has alleged that some of the defendants' statements during this skirmishing were defamatory. In addressing the sufficiency of the evidence to support this legal theory, the court has been handicapped in two ways. First, the complaint as filed in state court, and never amended, merely alleges at Count VIII in conclusory terms that "[t]he actions of the defendants, and each of them, constitute libel and slander." Complaint at ¶ 55. No specification

of any particular statement, made by any particular defendant, at any particular time, is offered. Second, the record contains at various places in the discovery and the submissions of the parties a welter of newspaper articles and statements both by Bennett and by some or all of the defendants that may or may not constitute libel or defamation. Without help, it would be impossible to discern exactly what statements in this barrage of verbiage the plaintiff claims to be actionable.

Fortunately, Rule 56 assists the court. The defendants' memorandum in support of their motion for summary judgment argued vigorously and at length—over some fourteen pages—that *none* of the statements contained anywhere in the record constituted libel or defamation as a matter of law. Under well-established law, the defendants' motion and argument transferred to the plaintiff the burden of specifying the statements alleged to be actionable. To shoulder this burden, plaintiff identified the following five statements as defamatory:

1. A statement appearing in the *Union–News* on March 4, 1997, attributed to Donoghue and referring to Bennett and Wagner as "two sub-standard performers [who] have given the department a black eye . . . . [Who] have impugned the integrity of this fine department . . . [and who] are not worthy of being here."

2. A statement appearing in the *Union–News* on June 12, 1998 attributed to Szostkiewicz calling Bennett and another officer "leading problem-causers."

3. A statement in the same article, also attributed to Szostkiewicz, stating that Bennett "has been a problem for years

---

**5.** The defendants dispute plaintiffs' claim that abuse of the sick leave provisions of the bar-

gaining agreement was permitted.

[and] ... has constantly worked to undermine the morale of this department."

4. A statement attributed to Arthur Therrien, purportedly appearing in the *Holyoke Sun* June 17–23, in which he refers to Bennett and Wagner as "the problem."

5. A statement in the July 1–7 edition of the *Holyoke Sun* in which Szostkiewicz refers to the fact that "there are some mean, nasty people in this city [who are] ... always coming out with accusations, but they never have any proof." Though the quotation never explicitly says so, the author of the article appears to imply that the "mean, nasty people" Szostkiewicz referred to must be Wagner and Bennett.[6]

On January 11, 1999, Bennett and his wife commenced this action in the Hampden County Superior Court. On January 22, 1999, Judge Lawrence B. Wernick denied plaintiffs' motion for a preliminary injunction seeking immediate reinstatement. On February 1, 1999, the defendants removed the action to this court under 28 U.S.C. § 1441.

### IV. *Discussion*

#### A. *Count One: Whistleblower Statute*

■ The defendants have raised three arguments in their discussion of Count One: first, that they are entitled to summary judgment on any claim arising from the Rodriguez MCAD complaint, based on the failure of the plaintiff to comply with the notice provisions of the statute; second, that two other portions of the plaintiff's claim are untimely; and, third, that by including the Whistleblower claim in his complaint plaintiff has necessarily waived all other claims under state law against all

the defendants. The court will address first the notice argument.

Mass. Gen. Laws ch. 149, § 185(c)(1) spells out specific requirements for persons who wish to disclose information to public bodies and receive the protection of the Massachusetts Whistleblower Statute. They must bring the "activity, policy or practice in violation of a law ... to the attention of a supervisor of the employee by written notice" and afford the employer a "reasonable opportunity to correct the activity, policy or practice." *Id.* In this case, Bennett filed his complaint on behalf of Officer Rodriguez to the MCAD, a state administrative organization that falls under the rubric of the statute's definition of "public body." He did not, however, provide the required written notice before making this filing.

The Whistleblower Statute provides that the notice requirements may be waived only under three conditions:

[I]f [the employee]: (A) is reasonably certain that the activity, policy or practice is known to one or more supervisors of the employer and the situation is emergency in nature; (B) reasonably fears physical harm as a result of the disclosure provided; or (C) makes the disclosure to a public body as defined in clause (B) or (D) of the definition for "public body" in subsection (a) for the purpose of providing evidence of what the employee reasonably believes to be a crime.

*Id.* The situation at the time of the MCAD filing was certainly not an "emergency in nature." At least a month had passed since the Cournoyer/Rodriguez incident before Bennett filed the MCAD complaint. Moreover, the record lacks any evidence of

---

**6.** It is true that plaintiffs' counsel identified these five statements as "examples" of defamatory statements, and that in his deposition the plaintiff himself identified a number of other statements that were, in his view, some-

how objectionable. No statement other than these five, however, is identified by the plaintiffs' counsel in her opposition to the motion for summary judgment; no others, therefore, may be offered or considered now.

a reasonable fear of physical harm. Finally, the MCAD qualifies as neither "(B) any federal, state or local judiciary, or any member or employee thereof, or any grand or petit jury" nor "(D) any federal, state or local law enforcement agency, prosecutorial office, or police or peace officer."

Due to this failure to comply with the notice provisions, defendants are entitled to summary judgment on the plaintiffs' claim under the Whistleblower Statute with respect to any supposed retaliation stemming from the filing of the Rodriguez MCAD complaint. Defendants do not contend that any other aspect of Count I is subject to summary judgment based on failure to comply with this notice provision.

■ In their second argument the defendants point out (a) that the Whistleblower Statute carries a two-year statute of limitations, and (b) that two alleged incidents of retaliation by Donoghue fall outside the limitations period and therefore, they say, may not be pursued now. The two incidents of retaliation are the discipline doled out in September 1996 when Bennett filed the Rodriguez MCAD complaint, and a second discipline imposed in October 1996 in response to Bennett's "fullest extent imaginable" email to Cournoyer. Plaintiff responds that the two acts of retaliation are part of a "continuing violation" and therefore survive summary judgment. It is not necessary to linger on this argument for long, because neither act may be considered under Count One, for independent reasons.

First, as noted above, the discipline provoked by the Rodriguez MCAD filing may not be pursued under the Whistleblower statute because of the lack of notice. Second, the "email" discipline cannot be pursued because the conduct involved in sending the email simply is not protected by the Whistleblower statute. The communication by Bennett to Cournoyer was not a disclosure to a "supervisor or public body"

of an activity that Bennett believed constituted a violation of law. Thus, on the facts of record, plaintiff has no claim under the Whistleblower statute for any conduct by the defendants occurring more than two years prior to the complaint's filing date. Given this, any statute of limitations argument is moot.

■ The defendants' third argument, based on "waiver," is more complex. Here, defendants argue, not that claims under the Whistleblower statute are subject to summary judgment, but that by filing under this statute plaintiff has necessarily waived most of his other state law claims against all the defendants. The argument is based on the following statutory language:

Nothing in this section shall be deemed to diminish the rights, privileges or remedies of any employee under any other federal or state law or regulation, or under any collective bargaining agreement or employment contract; except that the institution of a private action in accordance with subsection (d) shall be deemed a waiver by the plaintiff of the rights and remedies available to him, for the actions of the employer, under any other contract, collective bargaining agreement, state law, rule or regulation, or under the common law.

■ Very little decisional law has illuminated the meaning and scope of this waiver provision since the statute's passage. One Superior Court case, *Haddad v. Scanlon*, 1999 Mass.Super. LEXIS 272, construes the waiver as applying, at most, to related claims seeking damages essentially for the same conduct—*e.g.*, a discharge—that constituted the core retaliation for the whistleblowing, and not for other claims, such as intentional infliction of emotional distress, that are distinct from the claim to recover for the retaliatory action. This is surely correct. The Whistleblower statute was obviously designed to broaden protec-

tion to vulnerable workers, not to force them to jettison legitimate independent claims as a condition to invoking the statute.

■ The scope of the waiver is also defined by the identity of the proper defendant under the statute. The Whistleblower statute permits only an "employer" to be sued, not individual supervisors. *Orell v. UMass Memorial Medical Center, Inc.*, 203 F.Supp.2d 52 (D.Mass.2002). Because of this limitation, one Superior Court Judge has dismissed Whistleblower claims against individual defendants, but permitted the same individuals to be named on separate counts that would otherwise be subject to waiver. *Fisher v. Commonwealth of Massachusetts*, 2001 WL 1249650 (August 22, 2001). Again, given the intent of the statute to add to, not subtract from, protections afforded workers subject to improper pressures, this construction of the scope of the waiver seems correct. *But see, Haddad* (construing the waiver to apply both to the "employer" and to individuals acting on the employer's behalf).

The restriction of the scope of the statutory waiver to the "employer" alone is also supported by the language of the statute itself and, for the most part, by parallel authority in other states.

According to the Massachusetts Whistleblower Statute, "[a]n employer shall not take any retaliatory action against an employee" under certain enumerated conditions. Mass. Gen. Laws ch. 149, § 185(b). The statute defines employers as "the commonwealth, and its agencies or political subdivisions, including, but not limited to, cities, towns, counties and regional school districts, or any authority, commission, board or instrumentality thereof." Mass. Gen. Laws ch. 149, § 185(a)(2). The plain language of the statute suggests that the Massachusetts Legislature intended to exclude claims brought under the Whistleblower Statute against individual employees, even when acting in their official capacities.

Numerous courts have interpreted other states' whistleblower statutes to bar claims against individual municipal employees. *See Coffey v. Chattanooga–Hamilton County Hosp. Auth.*, 932 F.Supp. 1023, 1026 (E.D.Tenn.1996) (Tennessee statute does not ascribe liability to individual supervisors); *Harris v. Dist. Bd. of Trusts. of Polk Cmty. Coll.*, 9 F.Supp.2d 1319 (M.D.Fla.1998) (Florida statute does not create individual liability); *Fry v. McCall*, 945 F.Supp. 655, 665–666 (New York statute does not apply to individual employees); *but see Draper v. Astoria Sch. Dist. No. 1C*, 995 F.Supp. 1122 (D.Or.1998) (Oregon law does not necessarily preclude individual supervisors as defendants).

Given this authority, the proper ruling on the motion for summary judgment on Count One, and the scope of the waiver provision in the Whistleblower Statute as applied to this case, will be as follows. Summary Judgment will be allowed as to all defendants on this count except the employer, City of Holyoke. Summary Judgment will be allowed even as to Holyoke on the Rodriguez MCAD claim due to failure to comply with the statute's notice provision, and as to the "email" related discipline because those facts fall outside the ambit of the statute. The statute's "waiver" provision will apply to Holyoke only, and solely to those claims that may actually be pursued substantively via the Whistleblower Statute. In other words, if a claim cannot be pursued against Holyoke under the Whistleblower Statute, the waiver provision cannot be invoked to bar the claim when raised in another count.

B. *Massachusetts Employment Discrimination Statute (Count Two)*

■ The Massachusetts Employment Discrimination Statute, Mass. Gen. Laws ch. 151B not only prohibits certain forms

of employment discrimination, but also bars retaliation against any person who opposes discriminatory practices. Defendants' argument in support of summary judgment on this claim is anchored on their overly expansive "waiver" hypothesis regarding the effect of invoking the Commonwealth's Whistleblower statute. For the reasons set forth above, the court has rejected this theory.

The facts of record, viewed in the light most favorable to plaintiff, provide sufficient evidence, if believed, to support a reasonable jury in concluding that Donoghue, Szostkiewicz and Cournoyer retaliated against Bennett for his filings with the MCAD. The motion for summary judgment will be denied as to them. In addition, since plaintiff is barred from pursuing the City of Holyoke for retaliation arising from the Rodriquez MCAD complaint under the Whistleblower Statute, due to his failure to give proper notice, the motion for summary judgment will be denied as to any claim under Ch. 151B against the City of Holyoke arising from that incident.

■ No evidence suggests that defendant Therrien engaged in any conduct prohibited by Ch. 151B. The most that can be said is that he protested allegations against him that he deemed false and insisted that certain departmental rules be enforced. This kind of conduct cannot be construed as retaliation. Summary judgment on this count will enter in his favor.

It should be emphasized that this ruling constitutes a modification of the ruling contained in the court's brief memorandum of October 17, 2002. There, the motion was described as allowed on Count Two, except as to Donoghue and Holyoke. A closer review of the record reveals sufficient evidence against Szostkiewicz (the failure to promote) and Cournoyer (discipline for including allegations against Therrien in the MCAD filing) to warrant denial of the motion as to them as well.

## C. *Massachusetts Privacy Act (Count Three)*

Under Massachusetts law, "A person shall have a right against unreasonable, substantial or serious interference with his privacy." Mass. Gen. Laws ch. 214, § 1B. Plaintiffs' only claim under this statute stems from the alleged breach of privacy by then-Chief Donoghue when relaying materials from Bennett's personnel file to Cournoyer to assist Cournoyer in blocking Bennett's promotion and in responding to Bennett's email. According to Bennett, the transferred information included "internal investigations that resulted in judicial proceedings in the courthouse, including [his] domestic situation, the Jonathan O'Brien complaint, and [his] indictment for the Monarca incident." (Docket 86, Exhibit 2, at 101–02).

■ Under Massachusetts law, public disclosure of private information must be unreasonable to constitute invasion of privacy. *See Pendleton v. City of Haverhill*, 156 F.3d 57, 64 (1st Cir.1998); *Bratt v. Int'l Bus. Mach. Corp.*, 392 Mass. 508, 467 N.E.2d 126, 134 (1984). To fall under the protection of the Massachusetts privacy statute, disclosed facts must be "of a highly personal or intimate nature." *Bratt*, 467 N.E.2d at 134–35; *see also Warner–Lambert v. Execuquest Corp.*, 427 Mass. 46, 691 N.E.2d 545, 548 (1998); *Cort v. Bristol–Myers Co.*, 385 Mass. 300, 431 N.E.2d 908 (1986). Moreover, there can be no invasion of privacy where facts, though highly personal, are already in the public domain. *See Brown v. Hearst Corp.*, 862 F.Supp. 622, 631 (D.Mass.1994) (no invasion of privacy where facts revealed in television broadcast already had been exposed in divorce trial and three newspaper articles); *see also Pendleton*, 156 F.3d at 64.

■ Disclosure to the broad public is not necessarily required for a valid privacy

claim. The disclosure of facts between coworkers is sufficient to violate privacy. *See Bratt v. Int'l Bus. Mach. Corp.*, 392 Mass. 508, 467 N.E.2d 126, 134 (1984) ("[T]he disclosure of private facts about an employee among other employees in the same corporation can constitute sufficient publication under the Massachusetts right of privacy statute.").

■ Recognizing that the issue is contested but drawing all inferences in favor of the plaintiffs, a reasonable jury could conclude that Donoghue violated the privacy statute by giving Cournoyer access to confidential files containing information, particularly about Bennett's domestic disputes, which was of a private or intimate nature and was not common knowledge in 1996. Similarly, a jury could conclude that knowledge about the O'Brien altercation was not in the public domain. Although Cournoyer asserts that the incident was "common knowledge" (Docket 86, Exhibit 1, at 21), there is no record of pertinent newspaper articles. Moreover, disclosure of past altercations may be invasive of privacy. *See Tate v. De Francesco*, 217 A.D.2d 831, 629 N.Y.S.2d 529 (N.Y.App. Div.1995), *appeal denied*, 86 N.Y.2d 712, 635 N.Y.S.2d 949, 659 N.E.2d 772 (1995) (involving altercation at correctional facility leading to death of inmate).

Because the record indicates that Donoghue was the only defendant who allegedly violated Bennett's privacy rights, by disclosing the contents of his personnel file, the court will enter summary judgment as to all other defendants on Count Three.

D. *Civil Rights Claims: First and Fourteenth Amendments, Massachusetts Civil Rights Act (Count Four)*

1. *Federal Constitutional Claims under 42 U.S.C. § 1983*

■ A claim by a public employee for violation of his right to freedom of expression presents a court with a somewhat troubling dilemma. On the one hand, a citizen does not lose his First Amendment rights simply by taking employment with some governmental agency; he retains the same right to speak openly about matters of public concern without fear of retribution as anyone else. On the other hand, a public employee does not gain any special advantage in disputes of a private nature, such as garden variety employment beefs, merely because the employer happens to be a state actor and therefore subject to suit under 42 U.S.C. § 1983. The First and Fourteenth Amendments do not "constitutionalize" the employer/employee relationship simply because the employer happens to be a governmental agency.

■ Addressing this dilemma, the Supreme Court has made it clear that in order to proceed with a civil rights claim such as the one offered by the plaintiffs here, the underlying statements that triggered the defendants' allegedly retaliatory action must have touched on a matter of "public concern." The seminal case in this area is the Supreme Court's decision in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 569, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). As the Court later noted, *Pickering* reflected "the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The Court has since explained that "the government as employer has far broader powers than does the government as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate in-

terest when it acts as sovereign to a significant one when it acts as employer." *Id.* at 675, 114 S.Ct. 1878.

■■■ Under *Pickering,* the court must proceed in four steps. *See Tang v. Rhode Island, Dep't of Elderly Affairs,* 163 F.3d 7, 12 (1st Cir.1998); *O'Connor v. Steeves,* 994 F.2d 905, 911 (1st Cir.1993), *cert. denied,* 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993); *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir. 1989), *reh'g denied,* 894 F.2d 414. First, the court must consider whether the employee was speaking "as a citizen upon matters of public concern." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Vickowski v. Hukowicz,* 201 F.Supp.2d 195, 206–07 (D.Mass.2002). Second, if the speech was a matter of public concern, the court must "balance the strength of the employee's First Amendment interest, and any parallel public interest in the information ... against the strength of the countervailing governmental interest in promoting efficient performance." *O'Connor,* 994 F.2d at 912. Third, if the court finds the balance tips toward the employee's First Amendment interests, "the plaintiff-employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision." *Id.* at 913. Fourth, if the plaintiff meets that test, "the defendant governmental entity must be afforded an opportunity to show 'by a preponderance of the evidence that [it] would have reached the same decision ... even in the absence of the protected conduct.'" *Id.* (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Generally speaking the first two factors are addressed by the court as matters of law. Thus, in the usual case, the court will have the responsibility to decide whether the plaintiff's statements addressed a matter of public concern, and whether (given the balance of interests in the specific context) the particular response to the statements was an actionable expression of retaliation. *See, e.g., Bass v. Richards,* 308 F.3d 1081, 1088 (10th Cir.2002).

The last two factors are generally for the jury. *Id.* The finders of fact will determine whether the plaintiff's protected statement (rather than, say, poor performance) was a substantial or motivating factor in triggering the adverse employment action, and whether, even if the statement was a triggering factors, the defendant would have taken the same action even if the plaintiff had never made the statement.

■■■ Turning to the first factor, this court finds that the statements of the plaintiff were directed to matters of public concern. Statements uncovering corruption within a police department are precisely the type of communications that demand strong First Amendment protection. As the Supreme Court has noted, speech on public issues is "the essence of self-government" and "occupies the highest rung of the hierarchy of First Amendment values." *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citations omitted); *see also O'Connor v. Steeves,* 994 F.2d 905, 915 (1st Cir.1993) (official misconduct "a topic of inherent concern to the community.") This court hereby finds that the statements made by Bennett regarding corruption and racism within the Holyoke police department *were* on matters of public concern.

■■■ Analysis of the second factor requires more extended discussion, in part because the law in this area is in general more nuanced, and in part because the facts of record in this particular case relevant to this factor are more complex.

The court will address the law first.

In balancing the interests served by Bennett's statements against the police department's legitimate interest in avoiding disruption of its public service mission the court may consider the time, place, and manner of the employee's expression. *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

Among the considerations are "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.*

Additionally, law enforcement agencies, as para-military organizations, are qualitatively different from other governmental branches; law enforcement employees are "subject to greater First Amendment restraints than most other citizens." *McMullen v. Carson*, 754 F.2d 936, 938 (11th Cir.1985)(citing *Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976)). "A police department has a more significant interest than the typical government employer in regulating the speech activities of its employees in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence." *Tyler v. City of Mountain Home, Ark.*, 72 F.3d 568, 570 (8th Cir.1995); *see also O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C.Cir.1998).

At this stage of the analysis the court also has the obligation to weigh Bennett's motive in making the statements. *O'Connor v. Steeves*, 994 F.2d 905, 915 (noting that "little weight" is afforded "vengeful and obstructionist interests.") The cor-

rectness or truthfulness of the statements may also be a fact to be considered. *Id.*, at 916, n. 8.

In weighing both the truth/falsity and motive underlying the plaintiff's statement the court must strike a sensitive balance. A person is entitled to speak upon matters of public concern without putting his employment in peril if he gets the details wrong. In *Pickering*, for example, the decision of Justice Marshall upholding the right of a school teacher to criticize the school board without suffering a retaliatory termination assumed that the statements contained in the teacher's letter to a local newspaper were erroneous. 391 U.S. at 570, 88 S.Ct. 1731.[7] Likewise, a plaintiff who personally dislikes, or bears a grudge against, a particular individual does not necessarily lose his right to make statements regarding that individual that raise matters of public concern, even if his motive in making the statements derives partially or completely from personal animus. In weighing the second factor, in other words, the truth of the statements, and the motive behind them, may be examined, but these considerations are only two of what may be a number of factors to be evaluated in striking the appropriate balance between the values behind free expression and efficient administration in the specific context.

This is not the simplest of legal frameworks, and the facts of this case as presented by the record on summary judgment fit awkwardly within it.

The thrust of Bennett's constitutional claim is that he suffered retaliation at the hands of the defendants for statements he made on an important public issue—corruption within the Holyoke Police Depart-

---

**7.** The *Pickering* court declined to decide the extent to which a knowingly or recklessly false statement would be entitled to First Amendment protections. *Id.*, at 573–575, 88 S.Ct. 1731.

ment—to the MCAD, the MLRC, the Attorney General and to newspapers. The record contains evidence supporting his position, particularly the nature, timing and tone of the discipline he received.

The heart of the defendants' argument on summary judgment is that, despite the superficial appearance of the issues raised, the motive behind Bennett's statements was not a public-spirited impulse to ventilate matters of vital concern to the community, but a personal desire to embarrass individuals within the department whom he harbored a grudge against and to disrupt the department with charges that he either knew were false or which he offered with reckless disregard for their falsity.

Some evidence does suggest that Bennett's conduct did not flow purely from civic mindedness. Bennett's decision to involve himself in the Rodriguez dispute coincides with the timing of Flores's warning that Donoghue and Cournoyer were assembling a report to undermine Bennett's chances of promotion. Although the record shows that Bennett discussed the Rodriguez dispute with Rodriguez's superior, it is undisputed that he declined to pursue internal channels before bringing the dispute to the attention of MCAD. *See Lytle v. City of Haysville, Kan.*, 138 F.3d 857, 865 (10th Cir.1998) (dismissing claims of whistleblower in police department who failed to use less disruptive channels). Defendants vigorously argue that all of Bennett's contributions to the public affairs discourse—his subsequent MCAD filings, filings with MLRC, and collaboration with the state attorney general's office—constituted no more than manifestations of self-interest in his ongoing dispute with Donoghue, Cournoyer and others at the department.

Given the jarring conflicts in the evidence, the ruling on the defendants' motion for summary judgment on plaintiff's § 1983 count is simple. It simply cannot be said that, as a matter of law, the defendant's interest in smooth administration of the police department outweighs the interest underlying protection of the plaintiff's speech in this context. An important feature of the record now before the court supporting this conclusion is the almost complete absence of any concrete evidence of actual disruption of the department caused by the plaintiff's speech. Putting aside the defendants' conclusory say-so, no evidence of record at this point suggests that Bennett's statements significantly undermined the operations of the workplace. Indeed it is hard to imagine that (beyond annoying the persons who were objects of his criticism) the complaints of one officer in such a relatively large police force would either disturb the delicate balance of the workplace or deteriorate employee morale. *See Biggs v. Village of Dupo*, 892 F.2d 1298, 1303–04 (7th Cir.1990) (discharge of police officer after critical interview in paper unlawful where interview caused no disruption in police force); *cf. Breuer v. Hart*, 909 F.2d 1035, 1040 (7th Cir.1990) ("A sheriff running a small police operation (here, 16 members) is not constitutionally required to ignore such disruptive dissension at the risk of allowing the Department to fall into disorder.").

Moreover, the Supreme Court cautions that "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Connick v. Myers*, 461 U.S. 138, 152, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). As noted, there is no question that the possibility of corruption within the Holyoke Police Department is a subject of paramount public concern. *See, e.g., Campbell v. Towse*, 99 F.3d 820, 828 (7th Cir.1996) ("Issues involving the proper allocation of police patrols and other departmental resources to various communities in a city are questions of serious public import that one would usually expect to

benefit from a full airing in the 'public marketplace of ideas and opinions.' ") (community policing matter of public concern), *cert. denied,* 520 U.S. 1120, 117 S.Ct. 1254, 137 L.Ed.2d 334 (1997); *Breuer,* 909 F.2d at 1038 (alleged thefts of county property by sheriff matter of public concern). With twenty years of experience, Bennett was uniquely qualified to discuss the problem; the public discourse should benefit from his informed perspective. *See Pickering v. Bd. of Ed.,* 391 U.S. 563, 572, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (valuing employees with "informed and definite opinions" as important contributors to public discourse). In view of all this, the court cannot conclude that, as a matter of law, defendants are entitled to summary judgment based on the analysis of the evidence on Pickering's second factor.[8]

■ Moving on to the third and fourth prongs of the *Pickering* analysis, a reasonable jury might conclude—drawing all inferences in the plaintiffs' favor—that the adverse employment actions by the defendants all were substantially motivated by Bennett's protected speech. While a jury may conclude, for example, that Donoghue's discipline of Bennett regarding the Rodriguez MCAD complaint constituted only an instance of the enforcement of appropriate departmental regulations, it might also justly conclude that the discipline was, in fact, aimed at punishing Bennett for airing the department's dirty laundry in a public forum. In terse language, Donoghue chastises Bennett's "incompetence" for having made "a complaint to an outside agency." (Docket 86, Exhibit 15). The disputed facts require the court to give responsibility for resolving the issue to a jury. Similarly the *Mt. Healthy*

issue—whether the defendants would have done the same thing even if Bennett had never spoken—is a question for the jury.

■ Defendants' arguments for absolute and qualified immunity are not persuasive. Decades of law have clearly established that a public employer may not discipline an employee for protected speech.

■ As the record indicates that defendants Cournoyer, Donoghue, Szostkiewicz, and the City of Holyoke all participated in disciplining and/or declining to promote Bennett, the plaintiff has a sustainable § 1983 claim with respect to these defendants. The record, however, is barren as to Therrien's involvement in the specific episodes of discipline described above. The court will therefore allow the motion for summary judgment regarding this count against Therrien.

### 2. *Massachusetts Civil Rights Act*

■ To bring a claim under the Massachusetts Civil Rights Act, a plaintiff must demonstrate:

(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion.

*Bally v. Northeastern Univ.,* 403 Mass. 713, 532 N.E.2d 49 (1989) (quoting Mass. Gen. Laws ch. 12, § 11I) (alterations omitted). Because the plaintiffs' 42 U.S.C. § 1983 claim still stands, plaintiffs have fulfilled the first two prongs of the test.

---

**8.** The denial of the defendants' motion for summary judgment in the analysis of *Pickering's* second factor does leave open the question of how the disputed issues of fact related to that factor are to be resolved. It would appear that an evidentiary hearing before the court, not the jury, may be required.

However, the plaintiffs fail to satisfy the third prong. The Supreme Judicial Court has defined threats, intimidation, and coercion as follows:

"Threat" in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct. [We accept] a definition of coercion from Webster's New International Dictionary at 519 (2d ed.1959): "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."

*Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 631 N.E.2d 985, 990 (1994) (citations omitted), *cert. denied*, 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 122 (1994); *see Carvalho v. Town of Westport*, 140 F.Supp.2d 95, 100–01 (D.Mass. 2001) ("[T]he Supreme Judicial Court has suggested that a showing of an 'actual or potential physical confrontation accompanied by a threat of harm' is a required element of a claim under the Act."). The court has been unable to locate an example of a physical confrontation accompanied by a threat of harm in record.

Accordingly, the court will allow defendants' motion for summary judgment under the Massachusetts Civil Rights Act.

E. *Breach of Contract (Count Five)*

■ Bennett freely admits that when he gave notice of his retirement on September 11, 1997, he "did not intend to retire" and that, as of December 1998, had not made any application with the Holyoke Retirement Board regarding his retirement. (Docket 1, Exhibit 1, ¶ 24). Bennett justifies this behavior as common practice; he contends that it was typical in the Holyoke Police Department for officers to submit retirement notices, use their ac-

cumulated sick leave, and then rescind the retirement notices.

Viewing the facts in the light most favorable to the plaintiff, the common practice to which Bennett refers was at best an informal understanding. In his decision denying Bennett's motion for a preliminary injunction, Judge Lawrence Wernick wrote, "Sergeant Bennett deliberately misled the police department in order to obtain the benefits to which he was not entitled and he obtained all such benefits." *Bennett v. City of Holyoke*, No. 99–20, slip op. at 7 (Mass.Super.Ct. Jan. 22, 1999). As a preliminary matter, the court hesitates to endorse this abuse of sick leave. Moreover, the plaintiffs have offered absolutely no authority standing for the proposition that an informal practice of perpetrating a charade of this sort (assuming it existed) rises to the level of an enforceable contract. Therefore, the court will grant the defendants' motion for summary judgment with respect to the plaintiffs' contract claims.

F. *Intentional Infliction of Emotional Distress (Count Six)*

■ The seminal case in Massachusetts for intentional infliction of emotional distress is *Agis v. Howard Johnson, Co.*, 371 Mass. 140, 355 N.E.2d 315 (1976). *Agis* set out the following four elements to prove an action for intentional infliction of emotional distress:

It must be shown (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress, and (4) that the emotional distress sus-

tained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

*Id.* at 318–19 (citations and alterations omitted). Plaintiffs encounter extreme difficulty to satisfy the "outrageous" requirement of the second prong. "Outrageous" does not encompass "workaday insults, annoyances, or even threats and petty oppressions," but rather "a high order of reckless ruthlessness or deliberate malevolence." *Conway v. Smerling,* 37 Mass.App.Ct. 1, 635 N.E.2d 268, 273 (1994). Since *Agis,* very few appellate cases have affirmed a jury verdict for a plaintiff under this standard. *See, e.g.,* 17A Richard W. Bishop, *Massachusetts Practice* § 26.2 at 396–97 (collecting cases).

Even taking facts in the light most favorable to the plaintiffs, the defendants' conduct, though hardly benign, at most rises to the level of "threats or petty oppressions." In ruling on a summary judgment motion, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court finds that no fair-minded jury could find the level of reckless ruthlessness or malevolence required under *Agis.*

**G. Intentional Interference with a Contractual Relationship (Count Seven)**

Under Massachusetts law, in order to maintain an action for intentional interference with a contractual relationship, a plaintiff must show (1) that he had a contract with a third party, (2) the defendant knowingly induced the third party to break the contract, and (3) the defendant's actions harmed the plaintiff. *See Devlin v. WSI Corp.,* 833 F.Supp. 69, 78 (D.Mass. 1993); *United Truck Leasing Corp. v.*

*Geltman,* 406 Mass. 811, 551 N.E.2d 20, 21 (1990). As a matter of logic, intentional interference with a contractual relationship cannot be alleged against a party bound by the contract. *See Zimmerman v. Direct Fed. Credit Union,* 262 F.3d 70 (1st Cir. 2001); *Devlin,* 833 F.Supp. at 78; 45 *Am. Jur.2d Interference* § 6 ("It is essential to a cause of action for tortious interference that the claim be directed against defendants who are not parties to the contractual or business relationship."). Therefore, the plaintiffs' claims against the City of Holyoke fail.

The claims against the individual defendants—all employees of the City of Holyoke—though dubious, still stand. Under Massachusetts law, corporate officials, 'in particular, defendant-supervisors, are entitled to a qualified privilege in an employment-based tortious interference case. *See Zimmerman,* 262 F.3d at 76; *Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 429 N.E.2d 21, 24 (1981). This qualified privilege may be overcome only by a showing of actual malice. *See Zimmerman,* 262 F.3d at 76; *Gram,* 429 N.E.2d at 24.

Certain situations lend themselves to proof of malice in the context of a tortious interference claim, such as a valid claim for unlawful discrimination and unlawful retaliation. *Zimmerman v. Direct Fed. Credit Union,* 262 F.3d 70, 77 (1st Cir. 2001) (Selya, J.). Because plaintiffs' § 1983 civil rights and retaliation claims still stand with respect to Donoghue, Cournoyer, and Szostkiewicz, the tortious interference claims with respect to these individual defendants will stand as well.

One *caveat* on this point must be emphasized. No claim for interference with contractual relations may be based on the specious allegation that defendants breached plaintiffs contract when they refused to permit him to withdraw his notice of re-

tirement. Any claim under this count must arise from some other demonstrated interference. Since the evidence of retaliation is sufficient at this stage to carry the claim past summary judgment, the sufficiency of this count may await the development of evidence at trial.

### H. *Defamation (Count Eight)*

"Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair his standing in the community." *Grande & Son, Inc. v. Chace*, 333 Mass. 166, 129 N.E.2d 898, 899 (1955). To prove defamation, a plaintiff must further demonstrate that the words "discredit[ ] the plaintiff in the minds of any considerable and respectable class of the community." *Muchnick v. Post Pub. Co.*, 332 Mass. 304, 125 N.E.2d 137, 138 (1955). Statements of fact or of opinion are by law not defamatory. *See Rotkiewicz v. Sadowsky*, 431 Mass. 748, 730 N.E.2d 282, 290 (2000) ("[M]any of the statements ... were, as a matter of law, not objectionable, either because they were true, or because they were subjective statements of opinion, and as such were not susceptible of being proven false.").

Traditionally, summary judgment on a defamation claim has been rare. Long ago, the Massachusetts Supreme Judicial Court wrote, "[t]he question ... whether a publication is defamatory or not, being dependent upon the effect produced upon the public or a considerable part of it, is one particularly fit for trial by jury." *Ingalls v. Hastings & Sons Pub. Co.*, 304 Mass. 31, 22 N.E.2d 657, 659 (1939). Thus, a motion for summary judgment will not be allowed unless "the statement complained of is not reasonably capable of being understood in a defamatory sense to the discredit of plaintiff in the minds of a considerable and respectable class of the community." *Poland v. Post Pub. Co.*, 330 Mass. 701, 116 N.E.2d 860 (1953).

Even with these admonitions in mind, the court must conclude as a matter of law that the only statement of the defendant Therrien identified by the plaintiff (that Bennett was "the problem") is not defamatory as a matter of law, for two reasons. First, it is a matter of opinion; second its content does not impugn the plaintiff in the eyes of "a considerable and respectable class of the community."

Statements of Donoghue and Szostkiewicz, on the other hand, deserve consideration. Donoghue's statement that Bennett was a "substandard performer" who has "given the department a black eye," "impugned the integrity of this fine department" and "is not worthy of being here" go beyond mere opinion and may be found, if a jury so concludes, to impugn the plaintiff to such a degree as to render the statements a basis for an award of damages. Similarly, Szostkiewicz's statement that Bennett "has been a problem for years" and "has constantly worked to undermine the morale of this department" deserve jury consideration. Plaintiff, of course, in deciding to pursue claims for defamation will open himself to evidence supporting the defense that the statements were in fact true.

Szostkiewicz's vague reference to "mean nasty people" does not provide an appropriate basis for a defamation claim, for two reasons. First, the statement lacks any clear identification of Bennett as the person being referred to, a requirement of ancient provenance. *McCallum v. Lambie*, 145 Mass. 234, 13 N.E. 899, 901–902 (1887) (reference to "certain parties" not enough). Second, the statements are no more than "rhetorical hyperbole" and "vigorous epithet[s]." *Greenbelt Cooperative Association, Inc. v. Bresler*, 398 U.S. 6, 14,

90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *see also Levinsky's Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 128 (1st Cir.1997) (First Amendment "prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts.")

### I. *Loss of Consortium (Count Nine)*

 A loss of consortium claim may be brought if the claimant's spouse has a valid tort claim. *See, e.g., Mouradian v. Gen. Elec. Co.*, 23 Mass.App.Ct. 538, 503 N.E.2d 1318, 1321 (1987) *reh'g denied*, 399 Mass. 1105, 507 N.E.2d 1056 (1987). In light of the plaintiffs' valid defamation and tortious interference claims, the motion for summary judgment with respect to the loss of consortium claim will be denied.

### V. *Conclusion*

For the reasons set forth above, defendants' Motion for Summary Judgment is hereby ALLOWED in part and DENIED in part. The motion is ALLOWED with regard to Count One as to all defendants except the City of Holyoke. As to Holyoke, the motion on this count is DENIED except as to claims relating to the Rodriguez MACD filing and the "email" discipline.

The motion is ALLOWED with regard to Count Two, except as regards the defendants City of Holyoke, Donoghue, Cournoyer and Szostkiewicz. Note: this ruling alters the October 17, 2002 order by denying summary judgment as to Cournoyer and Szostkiewicz on this count.

The motion is ALLOWED as to Count Three, except as regards the defendant Donoghue.

The motion is ALLOWED as to Count Four, except as to defendants City of Holyoke, Donoghue, Cournoyer and Szostkiewicz on the § 1983 claim only.

The motion is ALLOWED as to Count Five *in toto.*

The motion is ALLOWED as to Count Six *in toto.*

The motion is ALLOWED as to Count Seven, except as to Donoghue, Cournoyer and Szostkiewicz. Note: this ruling alters the October 17, 2002 order by denying summary judgment as to Cournoyer and Szostkiewicz on this count.

The motion is ALLOWED as to Count Eight, except as to Donoghue and Szostkiewicz. Note: this ruling alters the October 17, 2002 order by allowing summary judgment as to City of Holyoke, Cournoyer and Therrien on this count.

The motion is ALLOWED as to Count Nine as to defendant Therrien and is otherwise DENIED.

It should be noted that this ruling eliminates all claims against the defendant Therrien.

A superseding order will issue.

### *SUPERSEDING ORDER*

For the reasons set forth in the attached Memorandum, defendants' Motion for Summary Judgment is hereby ALLOWED in part and DENIED in part. The motion is ALLOWED with regard to Count One as to all defendants except the City of Holyoke. As to Holyoke, the motion on this count is DENIED except as to claims relating to the Rodriguez MACD filing and the "email" discipline.

The motion is ALLOWED with regard to Count Two, except as regards the defendants City of Holyoke, Donoghue, Cournoyer and Szostkiewicz. Note: this ruling alters the October 17, 2002 order by denying summary judgment as to Cournoyer and Szostkiewicz on this count.

The motion is ALLOWED as to Count Three, except as regards the defendant Donoghue.

The motion is ALLOWED as to Count Four, except as to defendants City of Ho-

lyoke, Donoghue, Cournoyer and Szostkiewicz on the § 1983 claim only.

The motion is ALLOWED as to Count Five *in toto*.

The motion is ALLOWED as to Count Six *in toto*.

The motion is ALLOWED as to Count Seven, except as to Donoghue, Cournoyer and Szostkiewicz. Note: this ruling alters the October 17, 2002 order by denying summary judgment as to Cournoyer and Szostkiewicz on this count.

The motion is ALLOWED as to Count Eight, except as to Donoghue and Szostkiewicz. Note: this ruling alters the October 17, 2002 order by allowing summary judgment as to City of Holyoke, Cournoyer and Therrien on this count.

The motion is ALLOWED as to Count Nine as to defendant Therrien and is otherwise DENIED.

It should be noted that this ruling eliminates all claims against the defendant Therrien.

It is So Ordered.